## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| US AIRLINE PILOTS ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| v. | ) | |
| | ) | |
| US AIRWAYS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff US Airline Pilots Association ("USAPA"), through its attorneys, files this action to vacate a System Board of Adjustment (the "SBA") arbitration award rendered pursuant to a collective bargaining agreement between USAPA and US Airways, Inc. ("US Airways").

## INTRODUCTION

Over the past decade, US Airways pilots (the "Pilots") endured over nine billion dollars in wage cuts and other concessions, including termination of their defined benefit pension plan, as US Airways struggled to emerge from two bankruptcy reorganizations.  On January 1, 2010, US Airways added insult to injury when it refused to restore the Pilots' pay rates as required by the collective bargaining agreement, even though absent the Pilot's concessions US Airways could not have survived the unprecedented financial disasters imposed on the industry as a result of the September 11, 2001 terrorist attacks.

In February of 2010, the parties arbitrated US Airways' breach on this "January 1, 2010 Restoration Issue." While awaiting the SBA's decision, US Airways committed a *second* breach of the CBA when it failed to give the Pilots a 3% pay raise scheduled to take effect on May 1, 2010.  The 3% raise was negotiated as part of a 2002 Restructuring Agreement, which stated that "hourly pay rates will be increased by ... 3% on May 1 of the succeeding status quo period."

The 3% raise was preserved through two subsequent amendments, as the parties agreed that for "2009 and beyond" wages would be paid "[a]s per [the] Restructuring Agreement," and that unless specifically amended, the terms of the Restructuring Agreement remained in "full force and effect." Certain Pilots filed individual grievances with respect to US Airways' failure to increase pay by 3% (known herein as the "5/1/10 3% Issue"), but US Airways' Vice-President of Flight Operations held those claims in abeyance to see whether the SBA's award on the January 1, 2010 Restoration Issue also decided the 5/1/10 3% Issue.

In November of 2011, the neutral arbitrator issued a draft decision that did not address the 5/1/10 3% Issue. When questioned about the 5/1/10 3% Issue during an executive session held in March 2012, the neutral arbitrator stated he was unaware that the 5/1/10 3% Issue was before him. From the March 2012 executive session until the final award was issued in August 2013, USAPA repeatedly demanded that the SBA hold hearings on the 5/1/10 3% issue so that the SBA could consider the issue with the full benefit of all relevant exhibits and testimony. The neutral arbitrator refused to open the record that was over 3½ years old by the time the final award was issued in August, 2013. The SBA never held separate hearings on the supplemental 5/1/10 3% Issue.

The SBA ultimately denied USAPA relief on the 5/1/10 3% Issue, and in so doing denied the very existence of dispositive contract language from the Restructuring Agreement and the amendments that preserved the 3% raises with clarity. Incredibly, the SBA found that its "careful review" of the language of "the Restructuring Agreement ... discloses no specific reference to post-amendable date pay increases." Although the SBA's award does not reference the controlling terms anywhere in its decision, those terms are nonetheless in the parties' agreement

and cannot just be imagined away.  A breach of contract claim cannot be decided with reason if the applicable contract provisions are thought not to exist.

No award rendered under such circumstances could be in compliance with basic and established procedures under the collective bargaining agreement or the applicable Railway Labor Act. For these reasons, Plaintiff USAPA files this Complaint.

## PARTIES

1.      USAPA is a private, unincorporated association operating as a labor organization with a principal place of business located at 200 E. Woodlawn Road, Suite 250, Charlotte, North Carolina 28217.  USAPA is a "representative" as defined by § 151, Sixth, of the Railway Labor Act ("RLA"), 45 U.S.C. § 151, and is the certified collective bargaining representative of the Pilots.

2.      US Airways operates a commercial airline and is a "common carrier" within the meaning of 45 U.S.C. § 181.  US Airways maintains a principal place of business at 111 West Rio Salado Parkway, Tempe, Arizona 85281.

3.      Upon information and belief, US Airways is a wholly owned subsidiary of US Airways Group, Inc.  Upon information and belief, as of December 9, 2013, US Airways Group, Inc. is a wholly owned subsidiary of American Airlines Group, Inc.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337; 45 U.S.C. § 153 First (q), and § 153 Second.

5.      Venue is proper in this Court under Section 3, First (q) of the RLA because US Airways operates in this district and USAPA does business in this district.

## FACTS

6.      USAPA has been the certified collective bargaining representative of the Pilots since April 18, 2008.  Prior to April 18, 2008, the Air Line Pilots Association, International ("ALPA") represented the Pilots as their certified bargaining representative.

a.  *History of contract negotiations and reductions on Pilot pay rates*

7.      US Airways and ALPA signed a Collective Bargaining Agreement with an effective date of January 1, 1998 (the "CBA"), relating to rates of pay, rules, and working conditions in accordance with the RLA.  Specifically, Section 3 of the CBA controlled the Pilots' hourly rates of pay.

8.      The airline industry suffered pronounced financial losses in the aftermath of the September 11, 2001 attacks.  US Airways was particularly affected because of the prolonged closure of Washington Reagan National Airport, the public's cutback in travel along the east coast, and increased security costs.

9.      In 2002, US Airways implemented a restructuring program in an attempt to decrease operating costs, including cuts to the Pilots' pay rates.  ALPA and the Pilots negotiated in good faith with US Airways in its request for concessions, and US Airways and ALPA signed a Restructuring Agreement with an effective date of July 1, 2002.  (A true and correct copy of the Restructuring Agreement is attached hereto as Exhibit A.)

10.      The Restructuring Agreement extended the amendable date of the CBA (*i.e.*, the date the CBA would next be subject to further negotiations) to December 31, 2008.

11.      Regarding the Pilots' rates of pay, the Restructuring Agreement stated, in pertinent part:

**Revisions to Hourly Pay Rates:** The hourly pay rates contained in Section 3 of the [CBA] will be revised as follows:

- The hourly pay rates in effect on June 30, 2002 will be known as the Book Rates. The actual rates will each be reduced on the Effective Date to the rates that were in effect on April 30, 2001. The parity review scheduled for May 1, 2003, and Letter of Agreement 47, as amended, will be canceled.

- Eliminate the LOA #61 1% lump sum increase scheduled for 2003.

- Hourly pay rates will be increased by a compounded 1% effective on May 1, 2003, May 1, 2004, May 1, 2005, and May 1, 2006, and further increased by a compounded 2% effective on May 1, 2007 and May 1, 2008, **and 3% on May 1 of the succeeding status quo period (i.e., the period past the Agreement amendable date).**

*See* Ex. A, Restructuring Agreement at 1 (emphasis added).

12.     Under the Restructuring Agreement, ALPA agreed to reduce the then current pilot pay rates to rates that were in effect one year prior, agreed to cancel a scheduled parity review, and agreed to eliminate a scheduled 1% lump sum increase, in exchange for US Airways agreeing to a series of annual compounded percentage rate increases effective May 1, 2003, through the succeeding status quo period.

13.     The negotiated increases expressly included a 3% increase to pilot pay rates effective May 1 of the succeeding year past the CBA's amendable date, which at the time was December 31, 2008.

14.     On August 11, 2002, a little more than one month following the effective date of the Restructuring Agreement, US Airways filed for voluntary Chapter 11 bankruptcy.  US Airways used the bankruptcy as leverage to extract further severe financial concessions from the Pilots.

15.    US Airways and ALPA signed a Letter of Agreement titled "Supplementary Cost Reductions" ("LOA 84") that amended the Restructuring Agreement effective January 1, 2003. (A true and correct copy of LOA 84 is attached hereto as Exhibit B.)

16.    LOA 84 again amended the Pilots' rate of pay as follows:

> HOURLY RATES OF PAY:  The actual hourly rates of pay to be paid to all pilots under the [CBA as amended by the Restructuring Agreement] will in each year be less than or greater than the actual hourly rates of pay specified under the Restructuring Agreement (*i.e.*, the actual hourly rates as increased each May 1) by the following percentage amounts.  These percentages are not cumulative **but are in each instance an adjustment of the hourly rate of pay that would otherwise have been paid under the Restructuring Agreement in the applicable pay period**.  Hence, in each year there will be two actual hourly rates of pay applicable to each position: the rate in effect from January 1 through April 30 and the rate in effect from May 1 through December 31.

| YEAR | PERCENTAGE CHANGE TO APPLICABLE RESTRUCTURING AGREEMENT RATES OF PAY |
|---|---|
| 2003 | (8.0%) |
| 2004 | (6.5%) |
| 2005 | (5.0%) |
| 2006 | (0.0%) No reduction |
| 2007 | 2.0% |
| 2008 | 2.0% |
| ***2009 & beyond*** | ***As per Restructuring Agreement*** |

*See* Ex. B, LOA 84 at 1-2 (emphasis added).

17.    Under LOA 84, US Airways: (a) eliminated the annual compounded percentage rate increases for the years 2003 through 2006 that the Pilots had negotiated as a term of the Restructuring Agreement; and (b) in fact <u>further</u> <u>reduced</u> the Pilots' rates of pay for the years 2003 through 2005.  LOA 84 required US Airways to increase Pilot pay rates by 2.0% for the years 2007 and 2008.

6

18.    For the years "2009 & beyond," US Airways and ALPA agreed that the percentage change to Pilots' rates of pay would be "as per Restructuring Agreement." The Restructuring Agreement expressly included a <u>3% increase</u> to pilot pay rates effective May 1 of the succeeding year past the CBA's amendable date, <u>and LOA 84 preserved that scheduled increase</u>.

19.    LOA 84 further provides that "[o]ther than as specifically modified in these documents all terms and conditions of the ALPA-US Airways Collective Bargaining Agreement effective January 1, 1998 as amended by the Restructuring Agreement … <u>shall remain in full force and effect</u>." *See* Ex. B, LOA 84 at L84-2 (emphasis added).

20.    On September 9, 2004, US Airways filed for Chapter 11 bankruptcy for the second time in two years. US Airways once again used the bankruptcy to extract additional severe financial concessions from the Pilots, including yet more concessions to the Pilots' pay rates.

21.    On October 21, 2004, US Airways and ALPA signed a Letter of Agreement titled "Transformation Plan" ("LOA 93"). (A true and correct copy of LOA 93 is attached hereto as Exhibit C.)

22.    LOA 93 extended the CBA's amendable date from December 31, 2008 to December 31, 2009.

23.    LOA 93 once again amended the Pilots' rate of pay as follows:

**Revisions to Hourly Pay Rates:** The rates of pay specified in Section 3 of the [CBA], as modified by the Restructuring Agreement, will be revised as follows:

1. Freeze current rates effective 5/01/04 **through 12/31/09**.
2. Reduce rates as frozen by 18.0%

> 3. Reduce International pay override, as stated in Section 3(F) and Section 18(C), by 18% for transoceanic trips; eliminate international override for non-transoceanic trips.
> 4. Pay all flying at day rate.

*See* Ex. C, LOA 93 at 4 (emphasis added).

24.    Under LOA 93, US Airways not only froze the previously reduced pay rates through December, 31, 2009, but also further reduced pilot rates by an additional 18%.

25.    Despite these additional concessions, LOA 93 made clear that reductions in pay rates were limited to those terms expressly included in LOA 93, and that all other terms of the CBA as amended remained in full force and effect.  LOA 93 provides:

> NOW THEREFORE the parties mutually agree to amend the [CBA], Restructuring Agreement and the subsequent Letters of Agreement as stated in the Transformation Plan Term Sheet, below. ***Other than as specifically modified in these documents, all terms and conditions of the ALPA-US AIRWAYS Collective Bargaining Agreement effective January 1, 1998 as amended shall remain in full force and effect.***

*See* Ex. C, LOA 93 at 2 (emphasis added).

26.    The parties reiterated this point in the section immediately preceding the revisions to hourly pay rates, as LOA 93 further provides:

> **Other terms of 1998 Agreement, as amended:**    Other than as specifically modified in these documents, all terms and conditions of the ALPA-US AIRWAYS Collective Bargaining Agreement effective January 1, 1998 as amended shall remain in full force and effect.

*See* Ex. C, LOA 93 at 4.

27.    By virtue of these provisions, the terms of the Restructuring Agreement and LOA 84 remain in full force and effect to the extent not specifically and expressly amended by LOA 93.

28.     The Restructuring Agreement specifically included a 3% increase to pilot pay rates effective May 1 of the succeeding year past the CBA's amendable date, and LOA 84 expressly preserved that scheduled pay increase.  The "Revisions to Hourly Pay Rates" terms of LOA 93 did not in any way, either generally or specifically, modify the provision of the Restructuring Agreement or LOA 84 that provides for a 3% increase scheduled to take effect on May 1 of the succeeding year past the CBA's amendable date.

29.     As a result of the Pilots' generous concessions made through the Restructuring Agreement, LOA 84, and LOA 93, the last pay increase the Pilots experienced was in 2002, and from 2002 through 2009 the Pilots continually suffered a series of steep reductions to their pay rates.  Despite these multiple concessions, ALPA always preserved the 3% pay rate increase scheduled to take effect on "May 1 of the succeeding status quo period (*i.e.*, the period past the [CBA] amendable date)" as first negotiated for in the Restructuring Agreement and preserved in LOA 84.

### b.   *US Airways and USAPA arbitrate the 1/1/10 Pay Rate Restoration issue*

30.     Through a letter dated February 27, 2009, US Airways notified USAPA of its position that the pay rates in effect as of December 31, 2009, would remain in effect for Pilots as of January 1, 2010.

31.     On June 16, 2009, USAPA filed Grievance No. BPR 09-06-02 (the "Grievance") whereby USAPA claimed that the CBA and subsequent amendments (the Restructuring Agreement, LOA 84, and LOA 93) required the Pilots' pay rates to revert to what the rates would have been effective January 1, 2010, and not the then current significantly reduced rates then in effect. The question regarding the January 1, 2010 pay rates has been identified by the parties as the "1/1/10 Restoration Issue."

32.     In accordance with the CBA's grievance procedure, an initial hearing was held on the Grievance on July 24, 2009, before Captain Lyle Hogg, the Vice-President of Flight Operations.  On August 20, 2009, Captain Hogg denied the Grievance and held the rates of pay existing as of December 31, 2009, would remain in effect on January 1, 2010.

33.     The CBA created an SBA in compliance with § 184 of the RLA to determine disputes between the Pilots and US Airways growing out of grievances or out of the interpretation or application of the CBA.  (A true and correct copy of CBA Section 21, titled "System Board of Adjustment," is attached hereto as Ex. D.)

34.     USAPA submitted the Grievance to the SBA on September 9, 2009.  USAPA defined the issue before the SBA as:

> Whether [US Airways] misinterpreted and misapplied Section 3 of [the CBA], Letters of Agreement 84 and 93, the July 2002 Restructuring Agreement and all other related sections of the Agreement and Letters of Agreement, as well as past practice, when they stated that they do not intend to revert East rates of pay back to the status quo (as provided in the Restructuring Agreement of 2002 and LOA 84) after the past pay modification provided for in LOA 93 ceases to have effect after 12/31/09.

A true and correct copy of the September 9, 2009 submission to the SBA is attached hereto as Exhibit E.

35.     The SBA empaneled to decide the Grievance consisted of five members: two members selected by USAPA (Capt. Dave Ciabattoni and Theresa Murphy (the "USAPA Board Members")), two members selected by US Airways (Beth Holdren and Paul Jones (the "US Airways Board Members")), and a neutral member, Richard Kasher.

36.     The SBA held a hearing (the "Arbitration") from February 1 through February 4, 2010.  On the first day of the Arbitration the parties stipulated that the issue before the SBA was:

"Whether the pay rates in place on January 1, 2010 violate LOA 93, and, if so, what is the appropriate remedy?" The record closed on April 21, 2010.

### c. *US Airways subsequently refuses to honor its agreement to increase pay rates on May 1 by 3% while the 1/1/10 Restoration Issue lingers*

37.     May 1, 2010, marked the "May 1 of the succeeding status quo period (i.e., the period past the Agreement amendable date)" as first defined in the Restructuring Agreement and as amended in LOA 93.  The Pilots were scheduled to receive a long-overdue increase of 3% to their pay rates in accordance with the CBA, as amended.

38.     US Airways refused to increase the Pilots' pay rates effective May 1, 2010.

39.     On June 1, 2010, approximately 20 Pilots, including USAPA Board Member Capt. Dave Ciabattoni, filed electronic grievances with USAPA challenging US Airways' refusal to implement the scheduled 3% increase to the Pilots' pay rates as of May 1, 2010. While those grievances proceeded, on June 11, 2010, USAPA and US Airways submitted post-hearing briefs to the SBA regarding the 1/1/10 Restoration Issue.

40.     On October 8, 2010, three Pilots (on their behalf and on behalf of all similarly situated pilots) further pursued their individual grievances on the 5/1/10 3% Issue under the grievance procedure of the CBA.

41.     On March 29, 2011, Capt. Ed Schmidt held a hearing on the three Pilots' grievances on the 5/1/10 3% Issue.  On April 11, 2011, Capt. Schmidt denied the grievances, claiming that the 5/1/10 3% Issue was already pending before the SBA as part of the Grievance on the 1/1/10 Restoration Issue.

42.     The USAPA Board Members did not consider the 5/1/10 3% Issue to be part of the Grievance on the 1/1/10 Restoration Issue at the Arbitration held in February, 2010, as

evidenced by the fact that USAPA Board Member Capt. Dave Ciabattoni filed his own individual grievance on the 3% Issue back in June, 2010.

43.     The three Pilots appealed the denial of their grievances on the 5/1/10 3% Issue. In May, 2011, Capt. Hogg held those appeals in abeyance pending resolution of the 1/1/10 Restoration Issue.

44.     Although the Arbitration hearing concluded in February, 2010, the 1/1/10 Restoration Issue lingered for more than eighteen months without <u>any</u> action or direction from Arbitrator Kasher. On August 11, 2011, Kasher finally issued to the SBA a draft statement of background facts and positions of the parties.

45.     On November 9, 2011, Arbitrator Kasher circulated the first draft opinion on the 1/1/10 Restoration Issue. The draft opinion indicated that Kasher would deny the Grievance and hold the Pilots' pay rates effective January 1, 2010, would remain at rates that were in effect as of December 31, 2009.

46.     The draft opinion did <u>not</u> address the 5/1/10 3% Issue (*i.e.*, whether the Pilot pay rates would increase by 3% effective May 1, 2010, as provided for under the CBA as amended).

47.     On November 18, 2011, Arbitrator Kasher had a conference call to schedule an in-person executive session to discuss the draft opinion and award. On November 30, 2011, Arbitrator Kasher cancelled the scheduled session because of his personal health reasons.

### d. *Kasher refuses to hold hearings on the 5/1/10 3% Issue*

48.     On March 6, 2012, the SBA held an executive session in Philadelphia. Because the draft opinion did not discuss, decide, or address the 5/1/10 3% Issue, USAPA Board Members requested clarification from Arbitrator Kasher as to whether he considered the 5/1/10 3% Issue to be before him.

49.     Arbitrator Kasher admitted to the parties that he did not consider the 5/1/10 3% Issue to be part of the stipulated 1/1/10 Restoration Issue that was submitted to the SBA, and that he was not aware that the 5/1/10 3% Issue was before him.

50.     Because of Arbitrator Kasher's admission and acknowledgment that he was not aware that the 5/1/10 3% Issue was before him at any time, and certainly not when the Arbitration took place over two years prior, USAPA Board Members demanded that Kasher reopen the record, hold hearings on the post-facto, supplemental 5/1/10 3% Issue, and allow USAPA the opportunity to present evidence on the issue so that the issue to be decided would at least be known by the SBA when testimony was offered and exhibits were considered.

51.     Arbitrator Kasher denied USAPA's request for the opportunity to present live testimony or any other evidence on the post-facto, supplemental 5/1/10 3% Issue.

52.     Instead, Arbitrator Kasher ordered the parties to submit briefs (which he ordered not to exceed 10 pages) on the 5/1/10 3% Issue based solely on the existing record.  The testimony in the record then in existence was presented February 1-4, 2010, three months before the 5/1/10 3% Issue (violation) occurred, and when the SBA did not know it was deciding anything other than the separate 1/1/10 Restoration Issue. The parties nonetheless complied with the Arbitrator's orders, and submitted briefs on April 9, 2012.

53.     On October 9, 2012, Arbitrator Kasher circulated a second draft opinion and award addressing the 1/1/10 Restoration Issue.  On October 10, 2012, Kasher circulated his first draft opinion and award concerning the post-facto, supplemental 5/1/10 3% Issue, which indicated that Kasher would deny the 5/1/10 3% increase to pay rates that had not been increased since 2002.

54.    USAPA Board Members immediately requested another executive session to discuss the draft opinion on the 5/1/10 3% Issue and Kasher's refusal to conduct hearings on the issue.

55.    The SBA held an executive session on January 3, 2013.  Although Arbitrator Kasher admitted that he was experiencing "memory issues" as a result of his health issues, he yet again refused the USAPA Board Members' demand that the SBA conduct additional hearings. Arbitrator Kasher did request information from the USAPA Board Members as to how the post-facto, supplemental 5/1/10 3% Issue came to be before the SBA.

56.    On January 9, 2013, Arbitrator Kasher issued the final award on the 1/1/10 Restoration Issue denying the Grievance.  (A true and correct copy of the award concerning the 1/1/10 Restoration Issue is attached hereto as Exhibit F.)

57.    Over the next five months, the parties exchanged a series of letters to Arbitrator Kasher concerning how the 5/1/10 3% Issue came before the SBA.  Because of Arbitrator Kasher's obvious confusion on the issues, in correspondence dated January 11, 2013, January 21, 2013 and March 14, 2013, USAPA Board Members requested yet again that Arbitrator Kasher either relinquish jurisdiction of the 3% Issue or conduct hearings to provide the parties a fair opportunity to present all available evidence on the issue.

58.    On May 19, 2013, Arbitrator Kasher called USAPA and requested that it resend to him duplicate copies of all documents related to the 3% Issue sent by the parties between January 3, 2013 and May 19, 2013.  USAPA complied with this request.

   *e.  Kasher denies USAPA relief on the 5/1/10  3% Issue*

59.    On August 14, 2013, nearly three and a half years after the Arbitration concluded, and seventeen months after he first learned or believed that the 5/1/10 3% Issue was before the

SBA, Arbitrator Kasher issued a final Opinion and Award (the "Award") based on a vote of 3-2 that denied USAPA relief on the 5/1/10 3% Issue.  (A true and correct copy of the Award is attached hereto as Exhibit G.)

60.     The USAPA Board Members dissented and authored a dissenting opinion.  (A true and correct copy of the dissenting opinion is attached hereto as Exhibit H.)

61.     In denying USAPA relief on the 5/1/10 3% Issue, the SBA found, incredibly, that the language of "the Restructuring Agreement or Letter of Agreement 93 discloses no specific reference to post-amendable date pay increases." (*See* Ex. G, Award at 9.)

62.     In so holding, the SBA ignored plain, clear, unambiguous, and controlling language in the CBA, as amended, as follows:

   a.  The Restructuring Agreement expressly included a 3% increase to pilot pay rates effective May 1 of the succeeding year past the CBA's amendable date. It states that "the hourly pay rates will be increased by … 3% on May 1 of the succeeding status quo period."

   b.  LOA 84 preserved, with clarity, the scheduled increase when it provided that pay rate increases for the years "2009 & beyond" would be "as per Restructuring Agreement."

   c.  LOA 93 extended the CBA's amendable date from December 31, 2008 to December 31, 2009, froze pay rates only through December 31, 2009, and, when addressing "other terms of 1998 Agreement, as amended," expressly provided that "all terms and conditions of the ALPA-US AIRWAYS Collective Bargaining Agreement effective January 1, 1998 as amended shall remain in full force and effect."

Case 2:14-cv-00007-RCM   Document 1   Filed 01/02/14   Page 16 of 18

63.    The SBA did not cite or even mention in its Award the language of LOA 93 that expressly preserved all terms and conditions of the CBA, as amended, that were not otherwise modified by LOA 93.  The SBA did not cite or even mention the language of the Restructuring Agreement stating that "the hourly pay rates will be increased by … 3%." Instead, and again incredibly, the decision states that "a careful review of the language in either the Restructuring Agreement or Letter of Agreement 93 discloses no specific reference to post-amendable date pay increases." (*See* Ex. G, Award at 9.)

## COUNT I

64.    USAPA incorporates the allegations of Paragraphs 1 through 63 of its Complaint as though the same were set forth in full.

65.    The CBA, as amended, required US Airways to increase pilot pay rates by 3% effective May 1, 2010, which was the "May 1 of the succeeding status quo period (i.e., the period past the Agreement amendable date)."

66.    The SBA ignored the clear and unambiguous language of the CBA, as amended, when it denied USAPA relief on the 5/1/10 3% Issue and rendered an award that is not based on, and fails to even consider, the relevant terms of the CBA.

67.    The SBA's Award on the 5/1/10 3% Issue is wholly baseless and completely without reason and thus the SBA failed to conform or confine itself to matters within the scope of its jurisdiction.  A breach of contract grievance cannot be determined with reason of any sort when the existence of dispositive contract language is ignored.

WHEREFORE, Plaintiff US Airline Pilots Association respectfully requests that this Honorable Court enter judgment in its favor and against Defendant US Airways, Inc. and order the following relief:

a. vacate the System Adjustment Board's August 14, 2013, Opinion and Award;

b. remand the matter to the System Adjustment Board with instructions to enter an award in favor of USAPA on the 5/1/10 3% Issue;

c. award Plaintiff its costs of prosecuting this action, including attorney's fees, and award such further relief the Court deems just and proper.

## COUNT II

68.     USAPA incorporates the allegations of Paragraphs 1 through 67 of its Complaint as though the same were set forth in full.

69.     Section 153, First (i) of the RLA, regarding disputes between a group of employees and a carrier growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, provides that disputes referred to an SBA are referred "with a full statement of the facts and *all supporting data* bearing upon the disputes." (45 U.S.C. § 153 First (i)) (Emphasis added.)

70.     Section 153, First (j) of the RLA further provides that **"[p]arties may be heard either in person,** by counsel, or by other representatives, **as they may elect"** and the SBA shall give due notice of all hearings in any disputes submitted to it.  (45 U.S.C. § 153 First (j)) (Emphasis added.)

71.     Section 21(I) of the CBA concerning hearings before the SBA provides that employees covered under the CBA may be represented as they may choose and designate and that "[e]vidence may be presented either orally or in writing, or both." (*See* Ex. D.)

72.     The SBA failed to comply with the RLA and the CBA when rendering the Award on the post-facto, supplemental 5/1/10 3% Issue because the SBA improperly failed to hold hearings on the 5/1/10 3% Issue, refused to allow USAPA the opportunity to present all

supporting data bearing on the dispute, and refused to allow USAPA the opportunity to be heard in person on the 5/1/10 3% Issue.

73.    The SBA's failure to hold hearings on the 5/1/10 3% Issue denied USAPA a full and fair hearing on the issue and thus failed to comply with the RLA.

WHEREFORE, Plaintiff US Airline Pilots Association respectfully requests that this Honorable Court enter judgment in its favor and against Defendant US Airways, Inc. and order the following relief:

      a.  vacate the System Adjustment Board's August 14, 2013, Opinion and Award;

      b.  remand the matter to the System Adjustment Board with instructions to enter an award in favor of USAPA on the 5/1/10 3% Issue;

      c.  award Plaintiff its costs of prosecuting this action, including attorney's fees, and award such further relief the Court deems just and proper.

Date: January 2, 2014                    Respectfully submitted,

                                       METZ LEWIS BRODMAN
                                       MUST O'KEEFE, LLC

                      By:  /s/ Steven Petrikis
                           Steven Petrikis
                           PA I.D. No. 34426
                           Kenneth S. Kornacki
                           PA I.D. No. 83739

                           535 Smithfield Street, Suite 800
                           Pittsburgh, PA  15222
                           (412) 918-1100

                           Attorneys for Plaintiff
                           US Airline Pilots Association