# LETTER OF AGREEMENT
### Between

## US AIRWAYS GROUP INC, US AIRWAYS, INC.
### and
## THE AIRLINE PILOTS

**In the service of**
## US AIRWAYS, INC.

**as represented by**
## THE AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

---

## 2002 RESTRUCTURING AGREEMENT

---

THIS LETTER OF AGREEMENT is made and entered into in accordance with Title II of the Railway Labor Act, as amended, by and between US Airways Group, Inc. and US Airways Inc. (hereinafter referred to as the "Company") and the Airline Pilots in the service of US Airways, Inc. as represented by the Air Line Pilots Association (hereinafter referred to as the "Association").

WHEREAS the Tentative Restructuring Agreement was accepted by the MEC to be sent to the US Airways pilots for membership ratification on July 13, 2002, and

WHEREAS the US Airways pilots ratified the Restructuring Agreement on August 8, 2002.

NOW THEREFORE the parties mutually agree as follows:

1.  US Airways Group, US Airways Inc. and the Air Line Pilots Association, International have accepted the attached Restructuring Agreement as an amendment to the 1998 Pilots collective bargaining agreement (the "Pilots Agreement").

2.  The Restructuring Agreement shall become effective on the date of signing of this Letter of Agreement except for implementation dates specified otherwise in the Restructuring Agreement, and is not contingent on either of the two business conditions specified on page 3 of the Restructuring Agreement.



EXHIBIT

A

3. All other terms of the Pilots Agreement shall remain in effect unless specifically modified by the terms of the Restructuring Agreement.

4. In addition, the parties agree to meet promptly to develop the definitive contract language that will be incorporated into the amended Basic Agreement.

IN WITNESS WHEREOF,    the parties hereto have signed this Letter of Agreement this 11ᵗʰ day of August 2002.

FOR THE AIR LINE PILOTS
ASSOCIATION, INTERNATIONAL

Duane E. Woerth
President


Chris Beebe
MEC Chairman


WITNESS for the Air Line Pilots
Association, International:

Kelly Ison
Negotiating Committee Chairman

Donn Butkovic
Negotiating Committee

Phil Carey
Negotiating Committee

Gerry McGuckin
Negotiating Committee

Jeff Yokash
Negotiating Committee

FOR US AIRWAYS GROUP, INC.

David N. Siegel
President and CEO

FOR US AIRWAYS, INC.

Jerrold A. Glass
Sr. Vice President, Employee Relations


P. Douglas McKeen
Vice President, Labor Relations


WITNESS for US Airways, Inc.:

Edward Buler
Vice President, Flight Operations

Anthony J. Brafich Jr.
Director, Labor Relations – Flight

John H. McFall
Manager, Labor Relations – Flight

2

## ALPA Restructuring Agreement

US Airways Group, Inc. (the Company), US Airways, Inc. (US Airways) and Air Line Pilots Association (Association or ALPA) agree upon the following terms and conditions with respect to the Association's participation in the Company's restructuring program (Restructuring Program):

| | |
|---|---|
| **Effective Date:** | • July 1, 2002, subject to the conditions specified under "Business Conditions" and "Documentation and Approvals" below. |
| **Contract Extension:** | • The amendable date of the 1998 US Airways pilot collective bargaining agreement (Agreement) will be extended to December 31, 2008. The parties will commence bargaining for a new collective bargaining agreement no later than January 15, 2008 and will make every reasonable effort to complete such bargaining in time to secure a new, fully ratified, collective bargaining agreement prior to the amendable date. If the parties have not reached a tentative agreement by August 1, 2008, they will, no later than August 10, 2008, jointly apply for mediation with the National Mediation Board. |
| **Revisions to Hourly Pay Rates:** | The hourly pay rates contained in Section 3 of the Agreement will be revised as follows:<br><br>• The hourly pay rates in effect on June 30, 2002 will be known as the Book Rates. The actual rates will each be reduced on the Effective Date to the rates that were in effect on April 30, 2001. The parity review scheduled for May 1, 2003, and Letter of Agreement 47, as amended, will be canceled.<br><br>• Eliminate the LOA #61 1% lump sum increase scheduled for 2003.<br><br>• Hourly pay rates will be increased by a compounded 1% effective on May 1, 2003, May 1, 2004, May 1, 2005, and May 1, 2006, and further increased by a compounded 2% effective on May 1, 2007 and May 1, 2008, and 3% on May 1 of the succeeding status quo period (i.e., the period past the Agreement amendable date).<br><br>• Covered Pilots to receive override of 9% (including seniors, except for line check instructors who will receive an override of 10% per hour when performing training.)<br><br>• Pay Covered Pilots according to the equipment they are training on. |

|  | • A330 equipment to be compensated at pre-parity rate of $205.85/hour (12th year captain rate/widebody LOA). |
|  | • A320 and A321 equipment to be paid at Group 2 rates. |
|  | • Upon a change in control as defined in Section 1(D)2. of the Agreement, hourly rates of pay will be the greater of the existing rates of pay or the Book Rates. In addition to such hourly rates of pay, the Association will have the same right specified in Section 1(D)2 of the Agreement to extend the duration of the ALPA Restructuring Agreement for one, two or three years at the Association's option, past the amendable date of the ALPA Restructuring Agreement, with across-the-board wage increases of four and one half percent (4.5%) on the amendable date and on each annual anniversary of the amendable date thereafter. |
| **Small Jets:** | US Airways may permit US Airways Express operators to operate Small Jets on terms described in Attachment B. |
| **Domestic Code Share:** | As separately agreed, US Airways will be permitted to enter into code share agreements with domestic air carriers on terms described in Attachment C. |
| **International Code Share:** | As separately agreed, US Airways will be permitted to enter into code share agreements with foreign air carriers on terms described in Attachment D. |
| **Job Security:** | Provisions for no-furlough and minimum block hours will be on terms described in Attachment E. |
| **Grievances:** | Association to settle the grievances identified in Attachment E on terms specified in that Attachment. |
| **Fragmentation:** | Section 1.(F) of the Agreement will be modified to provide improved fragmentation protection as described in Attachment F. |
| **Financial Returns:** | • Financial returns as described in Attachment G. |
| **Exchange of Stock Options:** | • Exchange of Stock Options as described in Attachment H. |
| **Governance:** | • The Association will be entitled to elect and remove a member of the US Airways Group, Inc. Board of Directors on terms as described in Attachment I. |
|  | • Form a Labor Advisory Committee as described in Attachment I. |

| | |
|---|---|
| **Association Contract Items** | Additional Association contract items as described in Attachment J. |
| **Company Contract Items** | Additional Company contract items as described in Attachment J. |
| **Health, Welfare and Pension** | Changes as described in Attachment K. |
| **Contingent Acquisition Rights:** | The Contingent Acquisition Rights specified in Letter of Agreement 63 will be revised as described in Attachment L. |
| **Information:** | As described in Attachment M, the Company and US Airways will provide to the Association on no less than a quarterly basis certain information in order to permit the Association to monitor the pilots' investment. |
| **Bankruptcy:** | • The Company and US Airways will enter into a separate letter of agreement with the Association, as set forth in Attachment N. <br><br>• In addition, from the date of filing of a bankruptcy petition concerning US Airways to the end of the twelfth month following such filing, temporary changes will be made in the ALPA Restructuring Agreement as described in Attachment N-1. |
| **Fees and Expenses:** | The Company will pay the fees and expenses incurred by the Association in connection with the review, design, negotiation, approval, ratification and implementation of the Restructuring Program, including the fees and expenses of outside legal, investment banking and other advisors up to a total of $2.5 million in addition to the flight pay loss of three members of the negotiating committee for work after June 15, 2002. |
| **Business Conditions:** | • The ALPA Restructuring Agreement will be contingent on the completion of the following business conditions at the option of the Association: <br><br>• The ATSB has committed to a loan facility for the Company sufficient to enable the Company to restructure on an out-of-court basis; <br><br>• The Company's other labor groups, MSP aircraft lessors, vendors and other creditors have agreed to meaningful participation in the Restructuring Program satisfactory to the Association. |
| **Documentation and** | The Association's participation in the Restructuring Program will |

| Approvals: | additionally be contingent on membership ratification at the option of the Association and signature of the Association's president. |
|---|---|
| **Pension Contributions** | • Commencing one month following the Date of Signing by the President of ALPA and continuing through the amendable date and any subsequent status quo period, the Company shall be required to make monthly contributions (to the extent they are tax-deductible) to the Retirement Income Plan for Pilots of US Airways, Inc. ("Plan") on a cumulative basis, an amount equal to 15% of the Company's total pilot payroll (not constrained by IRS funding limitations) for the applicable month. |
| | • Each such payment to the Plan shall be made no later than the 15th day of the month following the month to which the payment applies. |
| | • In the event of a bankruptcy proceeding concerning the Company, the first payroll month against which the foregoing payments shall be made shall be the 13th month following the month in which the bankruptcy petition was filed, and the cumulative requirement shall commence with such 13th month. |
| | • If the Company's Mainline PRASM measured as of the end of the calendar year has exceeded the Mainline PRASM Base Case for that year (the "Excess"), the pension contribution for that year will be increased as follows:  50% of the Excess will be allocated to increased pension contributions up to a maximum of 20% of the monthly pilot payroll.  The Base Case for each year shall be the forecast levels as provided to the Association on May 21, 2002 in the Company's "020609 ATSB Submission Loan Application Plan A (v.20E)FINAL".  The pension payment shall be made no later than April 30th of the following year payable on a monthly basis for 12 months. |

## Attachment B

## Small Jets

The Agreement will be amended to authorize the operation of Small Jets by US Airways Express operators under the following terms and conditions:

| Definitions of Small Jets | • A "Small Jet" will be defined as a jet aircraft that is a Small SJ, Medium SJ, or Large SJ, as defined below.<br><br>• "Small SJs" are defined as jet aircraft with a certificated maximum seating capacity of 44 seats and a certificated maximum gross takeoff weight of 46,600pounds. In addition, Small SJs include the CRJ-240/400 aircraft with a maximum certificated seating capacity of 50 seats and a certificated maximum gross takeoff weight of 53,000 pounds, provided, however, that every such CRJ-240/400 aircraft will only be configured for operation with a seating capacity of no more than 40 seats. Any CRJ-240/400 aircraft configured for more than 40 seats shall be defined as a Medium SJ.<br><br>• "Medium SJs" are defined as jet aircraft with a certificated seating capacity of no less than 45 seats and no more than 50 seats and a certificated maximum gross takeoff weight not greater than 65,000 pounds, except for the CRJ-240/400 aircraft as described in the foregoing bullet point when configured for operation with a seating capacity of no more than 40 seats.<br><br>• "Large SJs" are defined as jet aircraft having a certificated seating capacity of 51-70 seats and a certificated maximum gross takeoff weight not greater than 75,000 pounds. In addition Large SJs include (a) the EMB-170 aircraft with a maximum certificated seating capacity of 78 seats and a certificated maximum gross takeoff weight of 82,100 pounds and (b) the EMB-175 aircraft with a maximum certificated seating capacity of 86 seats and a certificated maximum gross takeoff weight not greater than 86,000 pounds, provided, however, that every such EMB-170 and EMB-175 aircraft will only be configured for operation with a seating capacity of no more than 76 seats. Any jet aircraft configured for operation with more than 76 seats or with a certificated maximum gross takeoff weight greater than 86,000 pounds shall be operated by US Airways. |
| --- | --- |
| Authority: | • US Airways will be authorized to permit US Airways Express operators to operate up to 150 Small SJs, provided, however, |

| | |
|---|---|
| | that any CRJ-240/400 aircraft configured for more than 40 seats shall be defined as a Medium SJ as set forth above.<br><br>• In addition to the foregoing 150 Small SJs, US Airways will be authorized to permit US Airways Express operators to operate up to an aggregate of 315 Medium SJs and Large SJs.<br><br>• When the Company's active Group 2 or higher Mainline fleet exceeds 315 aircraft, the Company may add 2 additional Medium SJs or Large SJs for each additional Group 2 or higher aircraft in the Company's active fleet above the 315 number and one additional Medium or Large SJ for each Group 3 aircraft in the Company's active fleet. |
| **Definition of US Airways Active Fleet** | The aircraft in the then-current US Airways permanent bid plus 8% for maintenance and spares, with a minimum average daily utilization rate (measured on a monthly basis) of 10 hours measured by aircraft in the permanent bid of US Airways. |
| **Jets larger than Small Jets but smaller than Group 2** | Will be placed at US Airways under rates of pay determined by Section 6 of the Agreement (where applicable). |
| **Placement of Small Jets** | • Definitions:<br><br>➢ "MDA": Mid-Atlantic Airways<br><br>➢ "Participating Wholly-Owned Carrier": a carrier wholly owned by US Airways Group, Inc., other than MDA, that participates in the Jets for Jobs Protocol (Attachment B-3 below) and in the Restructuring Program<br><br>➢ "Participating Affiliate Carrier": a carrier that participates in the Jets for Jobs Protocol (Attachment B-3 below), other than a Participating Wholly-Owned Carrier or MDA.<br><br>• Participation<br><br>➢ Each of the Wholly-Owned and Affiliate Carriers will be offered an opportunity to participate in this program based upon the terms stated herein.  Should a Carrier elect not to participate, the program will continue with participation of the Carriers that wish to participate.<br><br>• Placement of Small Jets: |

6

|  | ➢ Large SJs: |
|---|---|
|  | • Will be placed only at Mid-Atlantic Airways (MDA). |
|  | ➢ Medium SJs: |
|  | ▪ The first group of up to 70 Medium SJs may continue to be placed at any carrier under the terms of the existing Section One and LOA 79 of the Agreement. |
|  | • The next group of 70 Medium SJs may be placed at Participating Affiliates or Participating Wholly-Owned Carriers. |
|  | ▪ Additional Medium SJs (i.e., those not placed under either of the two foregoing bullet points) will be placed at MDA, except that US Airways may place other Medium SJs at other Participating Wholly-Owned Carriers and Participating Affiliate Carriers, but it may do so only if the aggregate number of such Additional Medium SJs in the active fleets of US Airways Express carriers other than MDA (excluding those placed under the two bullet points above) shall not exceed 150% of the number of Medium SJs in the active fleet of MDA. The Medium SJ active fleet of a carrier shall consist of the number of aircraft in the permanent bid or its equivalent plus 8% for maintenance and spares. The daily utilization rate of Medium SJ aircraft in the active fleets of MDA and of the other US Airways Express carriers shall be no less than 7 hours per day measured on a monthly basis. |
|  | ➢ Small SJs: |
|  | ▪ May be placed at MDA, Participating Wholly-Owned Carriers, and Participating Affiliate Carriers. |
| **Job Opportunities— Carriers Other than MDA** | US Airways pilots on the Affected Pilot List as defined in Attachment B-1 below shall be eligible for no less than one-half of the job opportunities on Additional Small Jets (as defined in Attachment B-3 below) at Participating Wholly Owned Carriers and Participating Affiliate Carriers. |
| **Job Opportunities— Mid-Atlantic Airways** | • All MDA positions will be filled first by US Airways pilots, followed next by pilots from the Participating Wholly-Owned |

<table>
<tr><td></td><td>

Carriers on the Participating Wholly-Owned Carrier Pilot List as defined in Attachment B-1 below, followed by new-hire pilots. A US Airways pilot on the Affected Pilot List who has stated MDA as a preference may displace into MDA if he is senior to the most junior MDA pilot.

- All of the foregoing provisions providing for job opportunities and job rights between MDA, US Airways and the Participating Wholly-Owned Carriers shall be preserved as part of any agreement providing for change of control of MDA or sale of a majority of the assets of the MDA.

</td></tr>
</table>

| **Additional Bidding Provisions** | Notwithstanding any other provisions of the ALPA Restructuring Agreement, the following additional provisions apply to pilots on the US Airways pilot seniority list:<br><br>• Provision will be made to permit a US Airways pilot who would otherwise not have been furloughed to bid to an MDA vacancy in order to eliminate the furlough of a junior pilot who is not then on furlough. (Subject to resolution of Mainline training holds/training early/TDY/moving expense issues applicable to these pilots).<br><br>• In placing himself on the Affected Pilot List under Attachment B-1 below, he may express a preference for an MDA position limited to a Large Jet category.<br><br>• If he is employed by a Participating Wholly-Owned Carrier or Participating Affiliate Carrier, he may bid for a Large SJ MDA Captain vacancy and will be awarded such vacancy in order of his US Airways pilot seniority (subject to the training freeze and coverage hold provisions, below (see Recall to US Airways, paragraphs (a) and (b) and subject to early release based on the needs of the carrier).<br><br>• He may bypass an offer of employment with MDA without losing his position on the Affected Pilot List, regardless of his preference. He may bypass an offer of employment with a Participating Wholly-Owned Carrier or a Participating Affiliate Carrier without losing his position on the Affected Pilot List, regardless of his preference, so long as there are junior Affected Pilots available to accept such offer |
| **Recall to US Airways** | US Airways pilots shall be entitled to return to US Airways upon recall, except for the following provisions concerning holds: |

| | |
|---|---|
| | (a) A pilot who is trained to an SJ position will be subject to a 12-month training freeze effective upon commencement of training. |
| | (b) A pilot who has been recalled to US Airways but is prevented from accepting recall solely because he is being held at MDA, a Participating Affiliate Carrier or Participating Wholly-Owned Carrier for coverage purposes may be held at that Carrier for a maximum of nine months from the effective date of recall but not less than the training freeze specified in (a) above. [This provision would be extended to 12 months for any hold that commences within 12 months after the date of filing of a Chapter 11 petition concerning US Airways unless such petition is dismissed]. Example: Pilot A commences training as an SJ pilot on March 1, 2003. He is then recalled to US Airways effective September 1, 2003. He is subject to a total combined training freeze and hold until July 1, 2004. |
| | (c) The pilot who is recalled and under a training freeze or is being held under paragraphs (a) or (b) above, shall be made whole for pay and benefits to which he would have been entitled as an active pilot with US Airways. During the first four months he will be compensated at the rate of 76 hours per month. If the recalled pilot's training freeze or hold extends beyond four months, he shall receive 80 hours of pay if there is a junior pilot holding a line of time at US Airways. If no junior pilot is holding a line of time, the held pilot shall continue to receive 76 hours of pay. |
| **Flows between Carriers** | • Following the recall of all furloughed US Airways pilots, pilots employed by a Participating Wholly-Owned Carrier shall be eligible to flow through to any new-hire US Airways pilot positions in order of their seniority position on the integrated seniority list of pilots of Wholly-Owned Carriers ("Wholly-Owned Pilot Seniority List").<br><br>• Pilots employed by a Participating Wholly-Owned Carrier who become MDA pilots or US Airways pilots under this Attachment B, may flow back to their respective Participating Wholly-Owned Carriers. US Airways pilots employed by MDA, if furloughed from MDA, may displace into positions at Participating Wholly-Owned Carriers in order of their seniority as US Airways pilots. [Procedures to be discussed]. |

| Restrictions: | • Maximum of 6% of US Airways Express flight segments nonstop each month between US Airways hubs, excluding nonstop operations between LGA and DCA, BOS and LGA, and DCA and BOS. As used in the Agreement US Airways hubs are Charlotte, Philadelphia, Pittsburgh, or any airport having a monthly average of at least 50 US Airways departures per day on equipment other than turboprops or Small Jets. |
|---|---|
| | • No more than 25% of US Airways Express flight segments nonstop each month between two non-US Airways hubs, except nonstop flight segments that originate and terminate west of the Mississippi or in Florida, or that originate or terminate in the Caribbean. |
| | • No more than 4% of US Airways Express nonstop flight segments scheduled in the same direction within the same city pairs with departure times 30 minutes or less apart. |
| | • At least 80% of Small Jet nonstop flight segments each month in stage lengths of 950 statute miles or less. |
| Labor Disputes | • During a US Airways Express Small Jet Operator pilot labor dispute involving lawful self-help activities pursuant to the Railway Labor Act, the Company will not perform training of pilots for service as employees of that US Airways Express Small Jet Operator in connection with such labor dispute, nor will the Company's pilots operate aircraft of the US Airways Express Small Jet Operator during such labor dispute. |
| | • During a US Airways pilot labor dispute involving lawful self-help activities pursuant to the Railway Labor Act, no US Airways Express Small Jet Operator will perform training of pilots for service as employees of US Airways in connection with such labor dispute nor will a US Airways Express Small Jet Operator's pilots operate aircraft of the Company during such labor dispute. |

**Attachment B-1**

## Affected Pilot List and Participating Wholly Owned Carrier Pilot List

| **Affected Pilot List** | • An "Affected Pilot" is a pilot on the US Airways Pilots System Seniority List who (a) has been furloughed or has been issued notice of furlough under Section 23(B) of the Agreement (b) has been recalled to US Airways and subsequently has again been furloughed or issued notice of furlough, or (c) has received notice of furlough from MDA, a Participating Wholly-Owned Carrier, or a Participating Affiliate Carrier. |
|---|---|
| | • The names of Affected Pilots will be placed on a list entitled the US Airways Affected Pilot List ("the APL") in the order that their names appear on the US Airways Pilots System Seniority List. Pilots shall be removed from the APL in accordance with the terms of this Attachment B-1. |
| | • Affected Pilots may list their preferences for employment with MDA, Participating Wholly-Owned Carriers, or Participating Affiliate Carriers by submitting a preference form to US Airways. Affected Pilots may also list their preference for MDA positions limited to Large SJ aircraft. In addition, a pilot may also preference a category designated as "other" in which case the pilot will not be called for any Vacancy until such time as another Carrier is included in the preference list and the pilot has designated such Carrier as a preference. Once a pilot elects to bypass a Carrier, the pilot will forfeit future eligibility for Vacancies at that Carrier. Affected Pilots who do not specify their preferences will be given the opportunity to fill a Vacancy at a Carrier in order of seniority when there are no more Affected Pilots who expressed a preference for that Carrier. |
| | • An Affected Pilot's name will be removed from the APL when that pilot: |
| | • requests (in writing or electronically) to have his name removed; |
| | • is offered and accepts a Vacancy; |
| | • has been furloughed from US Airways and chooses not to accept a displacement into MDA if he expressed a preference for MDA and if he is senior to the most junior MDA pilot; |
| | • fails to accept a Vacancy with a Carrier for which he |

11

expressed a preference (whether MDA, a Participating Wholly-Owned Carrier or a Participating Affiliate Carrier), or expressed no preference for any Carrier, or did not express a preference for "other";

- fails to respond to reasonable, good-faith efforts by a Carrier to notify him of an employment opportunity or reporting time for a Vacancy within the time frame determined by the Carrier, with the understanding that the time frame will be no shorter than what is provided to any other person who is offered employment as a pilot with the Carrier;

- is considered for but is not offered employment with three Carriers solely because the pilot does not meet those Carriers' respective hiring criteria;

- retires, dies or is otherwise removed from the US Airways Pilots' System Seniority List;

- is recalled and has returned to active service as a pilot at US Airways under the Agreement, or fails to accept recall after recall has been offered.

- All furloughed US Airways pilots who do not resign or retire from US Airways will be required to keep a current address on file in accordance with Section 23(B) of the US Airways Working Agreement. In addition, they shall maintain a primary and secondary contact number with the US Airways Vice President of Flight Operations. They may also leave an electronic mail address as an alternate method of contact.

| | |
|---|---|
| **Management of the Affected Pilots List** | - US Airways will be responsible for managing the APL in accordance with the terms of this Attachment B-1.<br><br>- US Airways will also maintain and distribute to the Association on a monthly basis a "Master" copy of the APL that will identify by name those pilots who have been removed from the list, and the reason such pilot was removed (e.g., resigned, accepted employment with Carrier X, etc.). The Master copy will also identify the name of each pilot hired pursuant to the Protocol, including the name of the hiring Carrier, the position awarded and the date of hire.<br><br>- The monitoring of the APL will continue until all Affected Pilots have been removed from the APL. |
| **Participating Wholly-Owned Carrier Pilot** | Pilots from Participating Wholly-Owned Carriers shall be eligible for Small Jets positions at MDA whether or not they are on |

12

| List (for MDA Vacancies) | furlough. Wholly-owned status of the carrier must continue in order to maintain eligibility. The order of eligibility for MDA vacancies under the terms of this Attachment B shall be determined in order of seniority of pilots from Participating Wholly-Owned Carriers on the Wholly-Owned Pilot Seniority List. |
|---|---|

13

**Attachment B-2**
**Authority to Operate Mid-Atlantic Airways**

US Airways may permit Mid-Atlantic Airways to operate Small Jets using the US Airways designator code, name, logo, and marketing identity, if such carrier agrees to the operate under the terms of this Attachment B. MDA management and ALPA's designees will expeditiously negotiate a labor agreement, commencing no later than the date specified in a letter of recognition from MDA to ALPA. If the parties are unable to complete an agreement within 60 days after the commencement of negotiations, they agree to facilitation and arbitration of open terms, to be completed within 120 days of the commencement of negotiations. The facilitator/arbitrator shall be selected in accordance with the procedure specified below. As to each individual open issue the arbitrator shall select the proposal that more closely conforms to the average of ACO, CALEX, and CMR.

Upon commencement of negotiations, the parties will select the facilitator/arbitrator. The procedure shall be as follows:

1. The parties will exchange lists containing seven acceptable names as suggested neutrals.

2. If there are any common names on the lists, those arbitrators shall be contacted to determine their availability.

3. The neutral who is most available in accordance with the procedure stated in this Attachment B-2 shall be selected.

4. If there are no names in common on the lists, the parties will attempt to compile an agreed list. If unable to do so promptly, they will immediately contact the National Mediation Board and request a list of seven nationally-recognized arbitrators.

5. The neutral will be selected by alternately striking from the list identified in paragraph 4 above. The first strike will be determined by a coin toss.

6. If the selected neutral is unable to serve in accordance with the parties' time frame, the previously struck neutral will be selected. If no neutral is able to serve in accordance with such time frame, the parties may (a) extend the time frame by agreement or (b) request that the NMB supply an additional list of seven names, continuing this process until a neutral is selected.

| Recognition | MDA will provide to ALPA a letter recognizing ALPA as the representative of all pilots and check pilots/instructor pilots employed by MDA. |
|---|---|
| Job Opportunities, Flow through and Seniority | MDA will provide job opportunities, terms for flows between carriers, and terms for seniority as stated in this Attachment B. |
| Scope | Pilots on the MDA seniority list will perform: |

14

| | |
|---|---|
| | • All flying by and for MDA |
| | • All flight and simulator training and checking by and for MDA |
| **Change in Control and Successorship** | • Control as defined in Section 1(J) of the ALPA-US Airways Agreement except for the reference to Section 1(D)2 below. |
| | • If an entity other than US Airways Group acquires control of or is a successor to MDA, it will: |
| | • Maintain the MDA pilot agreement and recognition of ALPA (MDA Agreement) |
| | • Merge the seniority list of the MDA pilots with the seniority list of its pilots under ALPA merger policy if applicable or Sections 3 and 13 of Allegheny-Mohawk LPPs |
| | • If a change of control occurs as defined in Section 1(D)2. of the US Agreement, MDA shall provide ALPA the right to extend the MDA agreement for up to 3 years with 4.5% pay raises. |
| **Protection in Asset Sales** | • Same fragmentation protections as provided under the ALPA Restructuring Agreement. |
| **Foreign Operations** | • In the event MDA opens a pilot crew domicile outside of the United States or its territories, pilots assigned to such domicile shall be covered by all terms of the MDA Agreement and the Railway Labor Act. |
| | • All international flying by MDA shall be covered by all terms of this Agreement and the Railway Labor Act. |
| **Remedies** | • Section One grievances by Association filed directly to SBA, which must hear and decide grievance within 60 days of the filing. |
| **Compensation** | • Longevity for pay and benefit purposes of all pilots from US Airways and Participating Wholly Owned Carriers shall be based upon the pilot's longevity at US Airways or the Participating Wholly-Owned Carrier from which he came to MDA, together with his longevity at MDA. |
| | • The MDA Agreement shall provide that all US Airways pilots employed by MDA shall be paid the greater of the pay rate |

15

| | |
|---|---|
| | applicable to the aircraft/longevity that they hold or $50.00 per hour. |
| **Seniority and Probation** | • The order of pilots on the MDA Pilots' System Seniority List will be as follows:<br><br>1. US Airways pilots in order of US Airways pilot seniority.<br><br>2. Pilots from Participating Wholly-Owned Carriers in order of their positions on the Wholly-Owned Pilots Seniority List.<br><br>3. New-hire pilots in order of their dates of hire as MDA pilots.<br><br>• No Period of Probation for US Airways and Wholly-Owned pilots. |
| **Union Security** | Mainline Agency Shop and Dues Check Off |
| **Hiring Criteria** | A US Airways pilot on the APL automatically satisfies the hiring criteria for service as an MDA pilot. |

**Attachment B-3**

## Jets for Jobs Protocol—Carriers other than MDA

US Airways may permit Domestic Carriers to operate Small Jets using the US Airways designator code, name, logo, or marketing identity, if such carrier agrees to the terms of this Jets for Jobs Protocol.

| Definitions | |
|---|---|
| | • Carrier. A Domestic Air Carrier, other than the Company, that operates Small Jets under the Company's designator code, name, logo or marketing identity. |
| | • New Vacancy. A Small Jet (Captain or First Officer) position that is created at a Carrier as a result of a Carrier's taking delivery of, or announcing firm delivery of, Small Jets after the effective date of this ALPA Restructuring Agreement. The number of New Vacancies at a Carrier shall be determined according to the Small Jet staffing requirements established by the Carrier and shall be determined without regard to whether pilots employed by the Carrier are furloughed or remain on furlough. The term "New Vacancy" does not include a position on a Small Jet that is introduced as a replacement for a Small Jet that is operated under the authority of Section 1(B) 3.d (4) or Letter of Agreement 79, INTERIM SMALL JET AGREEMENT. |
| | • Backfill Vacancy. A Small Jet position (Captain or First Officer) at a Carrier that becomes open when a U Pilot vacates that position. |
| | • Vacancy. A New Vacancy or a Backfill Vacancy. |
| | • Affected Pilot. A pilot on the Affected Pilot List in accordance with Attachment B-1. |
| | • U Pilot. A former Affected Pilot who (i) accepts a New Vacancy or a Backfill Vacancy with a Carrier and enters into employment with that Carrier, and (ii) has not left the employ of a Carrier or has not been awarded a position at a Carrier as a result of a voluntary bid not covered by this Letter of Agreement. |
| **Filling of Vacancies** | At least 50% of New Vacancies (Captain and First Officer) and 100% of Backfill Vacancies (Captain and First Officer) will be made available to Affected Pilots and U pilots on a cumulative basis in accordance with this Protocol until the Affected Pilot List ("APL") has been exhausted. A Vacancy will be eliminated, and not be included in the formula specified by the foregoing sentence, if no |

17

| | |
|---|---|
| | Affected Pilot has accepted employment to fill the Vacancy and no U Pilot has bid the Vacancy. |
| **Determination of the number and duration of Vacancies** | • On the date that a Carrier agrees to operate Small Jets pursuant to this Attachment B, beyond the authority provided in Letter of Agreement 79 ("Additional Small Jets"), any Small Jet aircraft that are currently flying for that Carrier under the US Airways Code will be listed, by tail number ("Aircraft List"). The duration of the contract between the Carrier and US Airways will also be listed. |
| | • As the Carrier obtains Additional Small Jets, all such equipment shall be listed by tail number and added to the Aircraft List. The duration of the contract between the Carrier and US Airways will be forwarded to ALPA in accordance with this Attachment B. |
| | • If a Carrier adds to, removes, or replaces an aircraft that is flying under the US Airways Code, prior to the addition, removal or replacement, the Association shall be informed of the tail number of the affected aircraft. |
| | • If there is a reduction in the staffing needs of the Carrier because of the removal of an aircraft that was being flown under Letter of Agreement 79, or because the Carrier reduces the amount of Small Jet flying performed for an airline other than US Airways, the Carrier shall follow the procedures for reduction in force of its collective bargaining agreement or applicable employment policies. In that case, the number of New Vacancies and Backfill Vacancies will not be affected. |
| | • If there is a reduction in the staffing needs of a Carrier because of the removal of an Additional Small Jet, the Carrier shall determine if it projects an excess of pilots as a result of such reduction. If so, the Carrier shall inform the Association and may reduce the number of New Vacancies and Backfill Vacancies provided that at least 50% of Vacancies at that Carrier will continue to be held by or made available to U Pilots unless the ratio is altered in accordance with the "Filling of Vacancies" paragraph above. |
| | • All information required to be disclosed under this Protocol shall be forwarded to an individual designated by the US Airways MEC Chairman to receive and archive such information. The Association shall hold all confidential information in strict confidence. |
| **Hiring Criteria** | A US Airways pilot on the APL automatically satisfies the hiring criteria for service as a pilot for a Participating Wholly-Owned |

| | |
|---|---|
| | Carrier. Each Carrier to which this Attachment B-3 applies will apply the same upgrade criteria to U Pilots as it does to other incumbent pilots. In the event that an Affected Pilot turns down an offer of a New Vacancy, or is not offered employment for a Vacancy because the pilot does not meet the Carrier's hiring criteria, the Carrier will offer the New Vacancy to the next most senior Affected Pilot who meets the Carrier's hiring criteria. Neither a Carrier nor US Airways may require an Affected Pilot or U Pilot to resign from US Airways because the pilot accepted, entered into, or continued in employment with the Carrier. |
| **Rates of Pay** | All pilots employed by a Carrier during their first year of service under this Letter of Agreement shall be paid, by the Carrier, first year Captain rates applicable to the jet equipment flown, regardless of seat occupied. In subsequent years of service, longevity pay increases, based upon Captain's rates, shall apply. |
| **Other Conditions** | Other than as provided in this Letter of Agreement, U Pilots will be governed by the applicable policies, practices and labor agreement of the employing Carrier. |

**Attachment C**
**Code Share Agreements With Domestic Air Carriers**

Section 1 of the Agreement has been amended to permit US Airways to place its designator code on the flights of {Designated Domestic Carriers} (in addition to flights that operate as US Airways Express), under the following terms and conditions:

| A. Authority: | To place the US Airways designator code on the flights of other [Designated] Domestic Air Carriers (OAL). This authority includes the authority to place the US designator code on the flights of the OAL's Express operators to or from the hubs of the OAL as described below. |
|---|---|
| B. Exclusions: | 1. Not between any "US Airways Hubs", defined as the following cities or airports: Charlotte, Philadelphia, Pittsburgh, or any airport having a monthly average of at least 50 US Airways departures per day on equipment other than turboprops or Small Jets (as defined in Paragraph M below). |
| | 2. Not to or from a US Airways hub, except for "Hub to Hub Flights", defined as nonstop flights operated using any type of equipment between a US Airways Hub and "OAL Hubs", (defined as _____, _____, or any airport having an average of at least 50 OAL departures per day on equipment other than turboprops or Small Jets), provided that: |
| | a. A ratio will be determined by dividing the aggregate number of Hub to Hub Flights of US Airways by the aggregate number of Hub to Hub Flights of the OAL for the first six months of 2002. This will be called the "Hub to Hub Flight Baseline Ratio". Beginning with the first anniversary of the effective date of the code share agreement between US Airways and the OAL, the ratio in each month between the aggregate number of Hub to Hub Flights of US Airways bearing the OAL code and the aggregate number of Hub to Hub Flights of the OAL bearing the US Airways code will equal or exceed 95% of the Hub to Hub Flight Baseline Ratio, unless otherwise authorized in writing by the US Airways MEC. |
| | 3. A ratio will be determined by dividing the number of Covered Flights (as defined in Paragraph M below) of US Airways by the number of Covered Flights of the OAL for the six months prior to the first anniversary of the effective date of the Alliance Code Share Agreement. This will be called the Covered Flight Baseline Ratio. Beginning with the first anniversary of the |

effective date of the Alliance Code Share Agreement, the ratio in each month between the number of Covered Flights of US Airways bearing the OAL code and the Covered Flights of the OAL bearing the US Airways code will equal or exceed 90% of the Covered Flight Baseline Ratio, unless otherwise authorized in writing by the US Airways MEC.

4. Not on feeder/express operators on behalf of the OAL except non-stop or one-stop to or from the OAL's domestic hubs, provided that one-stop operations may not touch a US Airways hub. Note: operations permitted by this paragraph do not count toward any of the numbers or restrictions in Attachment B.

5. The following limitation applies to "Atlantic Non-Hub Flights," defined as scheduled nonstop flights departing from each of (a) North America to Europe and (b) North America to the Caribbean Basin (as defined in Paragraph M below) from points other than (x) in the case of US Airways, a US Airways Hub and (y) in the case of OAL, an OAL Hub. A ratio will be determined by dividing the number of Atlantic Non-Hub Flights of US Airways by the number of Atlantic Non-Hub Flights of the OAL for the first six months of 2002. This will be called the "Atlantic Non-Hub Flight Baseline Ratio". Beginning with the first anniversary of the effective date of the Alliance Code Share Agreement, the ratio in each month between the number of Atlantic Non-Hub Flights of US Airways bearing the OAL code and the Atlantic Non-Hub Flights of the OAL bearing the US Airways code will equal or exceed 90% of the Atlantic Non-Hub Flight Baseline Ratio, unless otherwise authorized in writing by the US Airways MEC.

6. With respect to the limitations on Hub to Hub Flights, Covered Flights, and Atlantic Non-Hub Flights pursuant to paragraphs 2, 3 and 5 above, in the event US Airways is in breach of the applicable limitation in a given month, the following shall apply:

(a) US Airways can cure any such breach in a given month by promptly taking one of the following actions: (x) removing US Airways code from one or more applicable OAL flights as of the Next Published Schedule Change Date (as defined below), (y) adding applicable US Airways flights bearing the OAL code as of the Next Published Schedule Change Date, or (z) adding the OAL code to existing applicable US Airways flights not previously bearing the OAL code as of the Next Published Schedule Change Date. For the purposes of this Paragraph, the "Next Published Schedule

Change Date" for a given month shall be defined as the subsequent calendar month's major schedule change date, for which a change that is loaded may have effectivity up to three months later (e.g., a breach in June is cured by a schedule change loaded on the 5th of July that becomes effective no later than the 5th of October).

(b) US Airways may defer the cure of any such breach for up to three months beyond the timeframe specified in Paragraph a. above if the cause of such breach was an event or circumstance beyond the control of US Airways. The term "event or circumstance beyond the control of US Airways" means a natural disaster, labor dispute within the Company, grounding of a substantial number of the Company's aircraft by government agency or voluntary action by the Company for safety reasons in lieu thereof, which in either case could not be avoided or cured by the Company; reduction in flying operations because of suppliers being unable to provide sufficient critical materials for the Company's operations, revocation of the Company's operating certificate(s), war emergency or acts of terrorism.

(c) US Airways shall not be required to cure any such breach if, as a result of such cure, US Airways would trigger a termination event condition with the OAL as defined in the Code Share Alliance Agreement between US Airways and the OAL. Any change to an Alliance Agreement that would cause such breach to trigger a termination event condition would be deemed to be a material change that materially adversely affects the interests of the US Airways pilots within the meaning of Paragraph G below. In addition, if the requirement to cure is excused by the first sentence of this Paragraph, the parties shall meet to make a good faith effort to develop other ways to address the concerns generated by the breach.

7. In the event that either US Airways or the OAL acquires another air carrier and integrates that air carrier so as to form a single carrier, each of the Baseline Ratios in Paragraphs 2, 3 and 5 above shall be adjusted to include the increase in nonstop scheduled flights that result from the acquisition and integration of the acquired air carrier.

| | |
|---|---|
| C. Reciprocal Code Share Requirement: | US Airways shall use its commercially reasonable efforts to secure the placement of the OAL's designator code on the maximum number of US Airways departures, subject to the provisions of this |

| | |
|---|---|
| | Agreement, the provisions of the agreement between US Airways and the OAL, and any applicable laws, decrees, orders or regulations, flight number limitations, initial implementation constraints encountered in the first two years of the alliance agreement, unusual circumstances beyond the control of the Company or OAL, material breach or termination of the alliance agreements by OAL, or facility or other constraints that prevent US Airways from offering a code share product of sufficient quality to its customers. |
| **D. Block Space Agreements:** | 1.  US Airways shall not purchase or reserve Block Space seats with the OAL except on nonstop flights to or from the OAL's domestic hubs.<br><br>2.  US Airways shall not purchase or reserve more Block Space seats on the OAL than the number of Block Space seats purchased or reserved on US Airways by the OAL, measured on a quarterly basis. |
| **E. US Airways Aircraft:** | No direct or indirect transfer to the OAL of any aircraft owned, leased, operated or on order or option by or on behalf of US Airways, other than in the normal course of business (e.g., lease returns or sale of aircraft, orders or options on arm's length market terms). |
| **F. Marketing Identity:** | US Airways and the OAL shall maintain separate operating and corporate identities, including, but not limited to, names, trade names, logos, liveries, trademarks, or service marks, but permitting (in addition to the separate marks and names) the use of designator codes, frequent flyer program information, and other trademark trade name, logo or service marks that reflects the alliance relationship. |
| **G. Amendments to Alliance Agreements:** | 1.  Amendments or Changes to Alliance Agreements.  A copy of each amendment or change to any of the Alliance Agreements shall be provided to ALPA prior to implementation.  If such amendment or change, written or oral would be reasonably likely to (i) have a material adverse effect (defined for the purpose of this paragraph 1 as an economic impact exceeding $10 million per year) on the economic structure or benefits of the alliance to US Airways or OAL or (ii) otherwise materially change any of the Alliance Agreements and such change materially adversely affects the interests of the US Airways pilots:<br><br>a.  The amendment or change shall be subject to review and |

23

comment by ALPA for at least 14 days before it becomes effective.

b.  In the event that ALPA objects to any such amendment or change on the ground that it is not consistent with a condition of Paragraph 1, within 21 days after receipt of the amendment or change ALPA shall submit any objection to the System Board of Adjustment for expedited determination under Section 1 of the US Airways Pilots' Agreement to determine whether the conditions set forth in Paragraph 1 above exist. In addition to any other remedies that are awarded, either:

(i)  US Airways shall cancel or void the amendment or change to the Alliance Agreement(s) and take all other action necessary to restore the status quo that existed prior to the amendment or change to the Alliance Agreement(s) by a date no later than 15 days following the date of the arbitration decisions, or

(ii)  If the Company does not cancel or void the amendment or change to the Alliance Agreement(s) within the 15 day period, ALPA shall have the right to terminate this Letter of Agreement upon 30 days written notice to the company.

The System Board of Adjustment shall retain jurisdiction to determine any dispute with regard to compliance with the Award, including whether the status quo has been restored.

c.  Amendments or changes to the Alliance Agreements shall include a legend describing the provisions of this paragraph 1.

d.  This Letter of Agreement shall remain in full force and effect until the exhaustion of the procedures set forth in paragraphs 1.a.-1.b.

2.  Termination Notice. In the event that either Company or OAL provides a Termination Notice pursuant to the Code Share Alliance Agreement or any other agreement relating to the Alliance, and the other party accepts termination of less than the entire agreements or agreements, and such action is material and materially adversely affects the interests of the US Airways pilots, ALPA shall have the right to terminate this Letter of

24

| | |
|---|---|
| | Agreement upon 60 days written notice to the Company, with such termination to be effective upon termination of the portion of the relevant agreement or agreements relating to the Alliance.<br><br>3. Rulings of Government Authority. If, after the first anniversary of the Effective Date of the Alliance Code Share Agreement, as a result of any action or rulings of any governmental authority, or in response thereto, any material change is required to be made to any of the Alliance Agreements and such change materially adversely affects the interests of the US Airways pilots, the same procedures shall apply as in paragraph 1 above.<br><br>4. The provisions of paragraphs 1 through 3 above, regarding termination of this Letter of Agreement, shall be effective in all respects without regard to whether the parties are then engaged in collective bargaining pursuant to Section 6 of the Railway Labor Act. The Company expressly waives any and all rights whatsoever to argue that ALPA's rights under these provisions or exercise of such rights should be affected in any way by virtue of the status quo provisions of the Railway Labor Act. |
| **H. Labor Disputes:** | 1. No increased use of US Airways designator code by OAL during a cooling off period applicable to US Airways pilots or a lawful strike by US Airways pilots.<br><br>2. No payments other than those payments occurring during the ordinary course of business to US Airways from the OAL during a cooling off period applicable to US Airways pilots or a lawful strike by US Airways pilots.<br><br>3. No pilots trained by OAL may be hired to serve during a cooling off period applicable to US Airways pilots or a lawful strike by US Airways pilots. |
| **I. Arms' Length Transactions:** | Transactions between US Airways or the Company and the OAL shall be at arms' length (as would be conducted by independent, unaffiliated parties). |
| **J. Special Duration:** | The Company waives its right under the Railway Labor Act to make unilateral changes to Paragraph H of this Letter of Agreement on Code Sharing during periods of lawful self-help by the pilots employed by the Company. |
| **K. Terms of Alliance Agreement** | [1. This proposal is based upon the terms of the proposed alliance agreements as described to ALPA by US Airways on June 18, |

25

<table>
<tr><td></td><td>2002, including but not limited to the description of prorate methodology for allocating revenue between US Airways and the OAL, which fundamentally determines that each carrier earns revenue from its carriage of passengers on its own flights. ALPA will review the actual alliance agreement to which this proposal applies when the alliance agreement has been completed, and this proposal depends upon conformance of the final agreement to the terms as described on June 18, 2002.

2. Prior to the final implementation of this tentative agreement permitting Domestic Air Carrier Code Share Agreements, the parties agree that the Company and ALPA will review and discuss the terms, conditions or restrictions as negotiated by the pilot group of the OAL to discuss whether any modifications to this tentative agreement are warranted.

REMOVE THIS LANGUAGE PRIOR TO FINAL EXECUTION].</td></tr>
<tr><td>L. Enforcement</td><td>The terms of this Attachment C will be included in a Letter of Agreement amending Section 1 of the Agreement, and will be enforced in accordance with the terms of Section 1.</td></tr>
<tr><td>M. Definitions</td><td>1. "Small Jets" shall be defined as [conform to other agreements]

2. "Covered Flights" shall be defined as scheduled nonstop flights operated by US Airways or the OAL on equipment other than turboprops or Small Jets between points within the region of the United States consisting of the states of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, West Virginia, Virginia, North Carolina, South Carolina, Georgia and Florida [and certain other states in the Eastern half of the U.S. to be determined based upon the identification of the OAL].

3. "Caribbean Basin" shall be defined as airports within Area 2 of the U.S. DOT World Area Code, and including the U.S. Virgin Islands, Puerto Rico, airports on the Gulf of Mexico coast of Mexico, and Belize.

4. The "Alliance Code Share Agreement" shall be defined as the _____ Agreement between US Airways, Inc. and OAL, Inc. dated _____, 2002. The "Alliance Agreements" shall be defined as the Alliance Code Share Agreement and the related agreements between the same parties also dated _____, 2002, consisting of the _____Agreement ("Prorate Agreement"), the _____Agreement ("Frequent Flyer</td></tr>
</table>

Agreement"), and the _____ Agreement ("Lounge Agreement").

5.   "Block Space" seats shall be defined as a quantity of seats purchased by US Airways on aircraft operated by the OAL, or purchased by the OAL on aircraft operated by US Airways, as applicable, at a contractually agreed price that are then available for resale at prices established by the purchasing carrier to the customers of such carrier.

27

**Attachment D**

**Code Share Agreements with Foreign Carriers**

The Company may place its designator code on the flights of Foreign Carriers under the following terms in addition to those in the present Agreement.

| A. Authority: | To continue to enter into and maintain code share agreements with Foreign Air Carriers to perform International Flying as defined in Section 1B.5. of the Agreement NOTE: Minimum block hour requirements shall no longer apply. |
|---|---|
| B. Definitions: | The term "Foreign Air Carrier" refers to any carrier by air other than an air carrier that is a citizen of the United States within the meaning of 49 U.S.C. Sec. 40102(a)(15), as that statute defines citizenship on the effective date of this Letter of Agreement.<br><br>The term "Foreign OAL" refers to any Foreign Air Carrier other than _____, _____ (each such listed carrier, a "Foreign North American OAL", and collectively, "Foreign North American OALs").<br><br>The ratio determined by dividing the aggregate number of Foreign Hub to US Airways Hub Flights of US Airways by the aggregate number of Foreign Hub to US Airways Hub Flights of each Foreign OAL for the twelve months of data available prior to US Airways' entry into a code share relationship with such Foreign OAL shall be called the "Foreign Baseline Ratio" for such Foreign OAL.<br><br>"Foreign Covered Flights" shall be defined as scheduled nonstop flights operated by US Airways or a Foreign North American OAL on equipment other than turboprops or Small Jets between points within the country of citizenship of the Foreign North American OAL and points within the region of the United States consisting of the states of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, West Virginia, Virginia, North Carolina, South Carolina, Georgia and Florida [and certain other states in the Eastern half of the U.S. to be determined based upon the identification of the OAL, consistent with Attachment C definition].<br><br>"Small Jets" shall be defined as [conform to other agreements]. |
| C. Restrictions: | 1.  No placement of the US Airways designator code on flights of Foreign OALs or Foreign North American OALs to or from a |

US Airways Hub (as defined in Attachment C), other than flights to or from a foreign hub of the Foreign OAL or Foreign North American OAL ("Foreign Hub to US Airways Hub Flights").

2. Beginning with the effective date of the code share agreement between US Airways and a Foreign OAL, the ratio in each month between the aggregate number of Foreign Hub to US Airways Hub Flights of US Airways bearing the Foreign OAL code and the aggregate number of Foreign Hub to US Airways Hub Flights of the Foreign OAL bearing the US Airways code (the "Monthly Ratio") will equal or exceed 95% of the Foreign Baseline Ratio for such Foreign OAL, unless otherwise authorized in writing by the US Airways MEC. Notwithstanding the above, the Company shall have met its obligation in the preceding sentence in the event that both (x) the Monthly Ratio for a Foreign OAL does not equal or exceed 95% of the Foreign Baseline Ratio for such Foreign OAL, and (y) the Monthly Ratio for such Foreign OAL would equal or exceed 95% of the Foreign Baseline Ratio if either: (a) US Airways were to operate less than one additional daily flight from one of the US Airways Hubs to a foreign hub of the Foreign OAL, or (b) the Foreign OAL were to operate less than one fewer daily flight from one of the foreign hubs of the Foreign OAL to one of the US Airways Hubs.

3. A ratio will be determined by dividing the number of Foreign Covered Flights of US Airways by the number of Foreign Covered Flights of each Foreign North American OAL for the twelve months prior to the effective date of the code share agreement between US Airways and such Foreign North American OAL. This will be called the Foreign Covered Flight Baseline Ratio for such Foreign North American OAL. Beginning with the effective date of the code share agreement between US Airways and a Foreign North American OAL, the ratio in each month between the number of Foreign Covered Flights of US Airways bearing the Foreign North American OAL code and the Foreign Covered Flights of the Foreign North American OAL bearing the US Airways code (the "Monthly Ratio" for such Foreign North American OAL) will equal or exceed 95% of the Foreign Covered Flight Baseline Ratio for such Foreign North American OAL, unless otherwise authorized in writing by the US Airways MEC. Notwithstanding the above, the Company shall have met its obligation in the preceding sentence in the event that both (x) the Monthly Ratio for a Foreign North American OAL does not equal or exceed 95% of the Foreign Covered Flight Baseline Ratio for such Foreign

29

North American OAL, and (y) the Monthly Ratio for such Foreign North American OAL would equal or exceed 95% of the Foreign Covered Flight Baseline Ratio if either: (a) US Airways were to operate less than one additional daily Foreign Covered Flight applicable to such Foreign North American OAL, or (b) the Foreign North American OAL were to operate less than one fewer daily Foreign Covered Flight.

4. With respect to the limitations pursuant to paragraphs 2 or 3 above, in the event US Airways is in breach of the applicable limitation in a given month, the following shall apply:

a. US Airways can cure any such breach in a given month by promptly taking one of the following actions: (x) removing US Airways code from one or more applicable Foreign OAL or Foreign North American OAL (collectively, for the purposes of this Paragraph a, "OAL") flights as of the Next Published Schedule Change Date, (y) adding applicable US Airways flights bearing the OAL code as of the Next Published Schedule Change Date (as defined below), or (z) adding the Foreign OAL code to existing applicable US Airways flights not previously bearing the OAL code as of the Next Published Schedule Change Date. For the purposes of this Paragraph, the "Next Published Schedule Change Date" shall be defined as the next practicable date at which an international schedule change with respect to the applicable market or markets could be loaded in the ordinary course of business (i.e., taking into account frequency limitations and/or IATA seasons if frequencies, slot availability or timings are a schedule constraint; and otherwise taking into account such limitations as may apply in the ordinary course of business for international schedule changes) for effectivity up to six months later (e.g., a breach in June is cured by a schedule change loaded on the 5th of July that becomes effective no later than the 5th of January).

b. US Airways may defer the cure of any such breach for up to twelve months beyond the time frame specified in Paragraph a. above if the cause of such breach was an event or circumstance beyond the control of US Airways. The term "event or circumstance beyond the control of US Airways" means a natural disaster, labor dispute within the Company, grounding of a substantial number of the Company's aircraft by government agency or voluntary action by the Company for safety reasons in lieu thereof, which in either case could not be avoided or cured by the Company; reduction in flying

30

| | |
|---|---|
| | operations because of suppliers being unable to provide sufficient critical materials for the Company's operations, revocation of the Company's operating certificate(s), war emergency or acts of terrorism.<br><br>5. In the event that either US Airways or the Foreign OAL or Foreign North American OAL acquires another air carrier and integrates that air carrier so as to form a single carrier, the applicable Baseline Ratios in Paragraph 2 or 3 above shall be adjusted to include the increase in nonstop scheduled flights that result from the acquisition and integration of the acquired air carrier. |
| **D.  Terms of Alliance Agreement** | The Company may enter into code share agreements with Foreign OALs and Foreign North American OALs provided that US Airways' compensation in such agreements will be predominantly limited to provisions specifying reciprocal frequent flyer and lounge access programs, revenue prorates or, in the case of joint venture arrangements, contribution sharing, which in each case as applicable will compensate US Airways for passengers carried by US Airways or for capacity provided by US Airways, as the case may be. |
| **E. Labor Disputes** | 1.  No increased use of US Airways designator code by a Foreign OAL or a Foreign North American OAL during a cooling off period applicable to US Airways pilots or a lawful strike by US Airways pilots.<br><br>2.  No payments other than those payments occurring during the ordinary course of business to US Airways from the Foreign OAL or Foreign North American OAL during a cooling off period applicable to US Airways pilots or a lawful strike by US Airways pilots.<br><br>3. No pilots trained by a Foreign OAL or a Foreign North American OAL may be hired to serve during a cooling off period applicable to US Airways pilots or a lawful strike by US Airways pilots. |
| **F. Special Duration** | The Company waives its right under the Railway Labor Act to make unilateral changes to Paragraph E of this Letter of Agreement on Code Sharing with Foreign OALs or Foreign North American OALs during periods of lawful self-help by the pilots employed by the Company. |
| **G. Enforcement** | The terms of this Attachment D will be included in a Letter of Agreement amending Section 1 of the Agreement, and will be |

enforced in accordance with the terms of Section 1.

**Attachment E**

**Job Security and Grievance Settlements**

| No-Furlough | No-furlough protection for all pilots as a result of productivity changes specified in the Restructuring Agreement, including any changes that may be implemented as a result of Attachment J discussions. |
|---|---|
| Minimum captains | Delete |
| Minimum scheduled block hours | On US Airways aircraft, no fewer than 934,400 block hours per year (including any status quo period) subject only to a new force majeure event. In the event of Chapter 11, the minimum shall be 832,200 block hours per year. For the period July 1, 2002 through December 31, 2002, the block hour minimums shall be 471,040; in Chapter 11—419,520. |
| Minimum Active Fleet | No less than 275 aircraft (including permanent bid plus 8% for maintenance and spares), with daily utilization rate measured monthly of 10 hours. In the event of Chapter 11, the minimum active fleet may be no less than 245 (permanent bid plus 8% for active spares). |
| Settlement of Grievances | The Association and US Airways will settle MEC Grievances 01-10-01 and 01-08-08 on the terms set forth in Attachment E-1 below. |

33

## Attachment E-1

## Settlement of MEC Grievances 01-10-01 and 01-08-08

| | |
|---|---|
| **Status Following Settlement** | ALPA MEC Grievances 01-10-01 (force majeure and minimum block hours) and 01-08-08 (duration of LOA 52) will be withdrawn with prejudice upon Date of Signing of the ALPA Restructuring Agreement by the President of ALPA. |
| **Force Majeure Following Settlement** | The force majeure declared by US Airways due to the terrorist attacks of September 11, 2001 will not be invoked as the basis for any further furloughs, provided that this provision does not limit the Company's ability to invoke future force majeure events. |
| **Terms for Settlement** | In addition to other items that have been provided in other Attachments of the ALPA Restructuring Agreement, such as terms for enhanced fragmentation protection, enhanced CAR protection, snapback protection in the event of a change in control, and provisions for Large Jet employment with MDA, as well as other employment provisions:<br><br>• US Airways will provide employee pass privileges for furloughed pilots and their families. |

34

**Attachment E-2**

## Settlement of other Grievances

| Arbitration | Agree to letter of agreement entitled "Accelerated Arbitration of Selected Cases." |
|---|---|
| Other grievances | Postpone discussions |
| Prior plan grievances | Postpone discussions |

35

## Attachment F

## Fragmentation

Section 1.F. of the Agreement will be modified to provide improved fragmentation protection as follows:

| Revised Section 1 (F) | (F) Other Protections |
|---|---|
| | If the Company transfers to an Entity (the "Transferee") (by sale, lease or other transaction) or disposes of aircraft or route authority which produced fifteen percent (15%) or more of the Company's operating revenues, block hours, or ASMs during the period of twelve (12) months immediately prior to the date of the agreement to transfer such aircraft or route authority (the "Transaction Date") (or the period from April 1, 2002 to the Transaction Date if less than twelve months), net of revenues, block hours or ASMs that are produced by aircraft or route authority that were placed into service during the same period (any such transfer, a "Substantial Asset Sale"), then: |
| | **1. Offer of Employment to US Airways Pilots.** |
| | The Company shall require the Transferee to offer pilot employment to eligible US Airways Pilots. The eligibility criteria shall be determined by agreement between the Company and the Association and shall be reasonably related to the assets transferred, the interests of the US Airways Pilots and the Company, and the nature and timing of the transaction among other issues. If the Association and the Company are unable to agree upon eligibility criteria that are consistent with the foregoing considerations, the System Board of Adjustment shall determine such eligibility criteria pursuant to the expedited procedures set forth in Section 1 (the "Transferring Pilots"). The number of pilot employment opportunities for Transferring Pilots shall be, as measured in the twelve (12) months prior to the Transaction Date, the sum of (i) the average monthly pilot staffing actually utilized in the operation of the aircraft transferred to the Transferee in connection with the Substantial Asset Sale plus (ii) the average monthly pilot staffing actually utilized in the operation of the route authority transferred to the Transferee in connection with the Substantial Asset Sale to the extent such pilot staffing is not included in the calculation of clause (i) above. Offers of employment that are rejected by a US Airways Pilot shall in turn be offered to other US Airways Pilots under the eligibility criteria determined under the first sentence of this subparagraph 1., until such opportunities have been exhausted. |

36

### 2. Seniority Integration.

The Company shall require the Transferee to provide the Transferring Pilots with the seniority integration rights provided in Sections 2, 3, and 13 of the Allegheny-Mohawk LPPs except that the integration of the Transferring Pilots into the Transferee's seniority list shall be governed by Association Merger Policy if both pre-transaction pilot groups are represented by the Association. The Company shall require each Transferee to agree, and such Transferee shall agree, to provide the seniority integration rights specified in the preceding sentence in connection with a Substantial Asset Sale in a written document enforceable against the Transferee by the Association and/or the Transferring Pilots.

**Attachment G**

**US Airways Group, Inc.**
**Financial Returns Term Sheet**

**Summary of Principal Terms**

| | |
|---|---|
| **Issuer:** | US Airways Group, Inc. |
| **Date of Issuance:** | As soon as practicable after ALPA notifies the Issuer of the persons to receive such shares and the number of shares to be delivered to each such person. ALPA may determine that such shares, in whole or in part, may be contributed to one or more qualified or nonqualified plans, subject to agreement by the Company based upon feasibility. |
| **Securities:** | 17.5 million shares of Restricted Stock of Issuer plus up to 11.5 million shares of Restricted Stock which may be issued under Attachment H ("ALPA Restricted Stock"), which shall be subject to re-negotiation (increase) if there is a material alteration to other stakeholders' shares distribution and, through June 30, 2012, which shall also be subject to increase (proportionate to dilution impact) to the extent that the Company at any time obtains authorization and issues more than 150 million shares, except for securities sold in the public market, securities issued to pilots, sales to Qualified Institutional Buyers, and sales of other shares for fair market value. In the case of bankruptcy, the form of securities may be modified to provide equivalent value (defined as 19.33% of the fully diluted common stock). |
| **Holders:** | To be determined by ALPA for the benefit of US Airways, Inc. pilots represented by ALPA, other than currently furloughed pilots. |
| **Vesting:** | One-seventh of the total number of shares will vest upon each of the first seven anniversaries of the Date of Issuance. A pilot who retires or dies prior to the first vesting date or between vesting dates shall be immediately vested in his pro rata share of the Restricted Stock earned to the date of his retirement or death, but shall not receive a further allocation for any period after he retires or dies. A pilot who is terminated for just cause following the conclusion of the System Board of Adjustment process or resigns shall forfeit any unvested shares of Restricted Stock. Automatic vesting of the total number of shares remaining unvested under Attachments G and H upon a change of control, as defined in Section 1(D)2 of the Agreement. |

| | |
|---|---|
| **Forfeitures:** | Forfeited shares will be returned to treasury shares for future issuances of Restricted Stock as directed by ALPA. |
| **Tax Treatment; Elections:** | No elections under Section 83(b) of the Internal Revenue Code of 1986 (the "Code"), shall be permitted with respect to any share of Restricted Stock. The parties intend that the Restricted Stock shall be issued with customary terms and conditions under Section 83 of the Code. Upon request of a recipient, the Company will withhold a specified number of shares to provide for potential anticipated tax liability due to the vesting of the Restricted Stock. (OK pending review by ALPA Tax Counsel). |
| **Fairness Provisions** | If all employee groups collectively, other than ALPA, receive, in any year, any payment or other consideration from a profit sharing plan or other financial return mechanism with a value in excess of the groups' collective share of the total employee concessions, as applied to the employee profit sharing program as defined in the ATSB Plan ("Base Profit Sharing Plan"), ALPA will be entitled to receive a matching proportional share of the value received by all other employee groups in excess of the Base Profit Sharing Plan payment. <br><br> For example, if the share of the total employee concessions of all employee groups other than ALPA was 45%, and the share of the profit sharing program allocated to such groups is 60%, they have been allocated 15% more than their proportionate share of the employee profit sharing program. ALPA's share of total employee concessions (55%) is 1.22 times the share of concessions of all other employee groups (55% divided by 45%). As a result, ALPA would be entitled to receive a 18.33% share of the program (1.22 times 15%). |

**Attachment H**

**Exchange of Old Options for Shares of Restricted Stock**

| | |
|---|---|
| **Options Eligible for Exchange:** | All options granted under the First, Second, Third, Fourth and Fifth Grant Dates under the Letter of Agreement No. 69 and held by option holders on the pilots' seniority list of US Airways on the Effective Date. (All such options shall be referred to as the "Options"). |
| **Shares to be Issued Upon Exchange:** | Options tendered by the eligible option holders and accepted for exchange by the Issuer will be exchanged on the day that the Issuer cancels such Options ("Exchange Date") for a number of shares of ALPA Restricted Stock of the Issuer equal to the total number of shares subject to the Options that the holder has exchanged (rounded down to the nearest share), subject to adjustments for any stock split, stock dividends and similar events. |
| **Waiver:** | As a condition to the exchange of Options for ALPA Restricted Stock, eligible option holders will be required to expressly waive any and all rights, if any, under Section 8 (c) of the Company's 1998 Pilot Stock Option Plan (the "1998 Plan"), which rights arise out of or relate to any equity or equity-like instrument or profit sharing contribution provided by the Issuer in connection with its 2002 Restructuring Program in connection with all Options granted or to be granted under the 1998 Plan. ALPA will also agree not to pursue such rights except as required to establish the dispute resolution mechanism under Paragraph 3(c) of Letter of Agreement #69, ("1998 Pilot Stock Option Plan and Agreement"). The Company shall provide to ALPA an opinion of its outside securities counsel, addressed to ALPA, specifying that such an exchange, including a holder's waiver of rights as described in this paragraph, complies with all legal and regulatory requirements; the Company shall also indemnify the Association in connection with such waivers. |
| **Vesting:** | Restricted Stock under this exchange program will vest over seven years with one-seventh of such stock vesting upon each of the first seven anniversaries of the Exchange Date (each such date, a "Vesting Date") in the same manner as the 17.5 million shares of Restricted Stock under Attachment G. |
| **Exchange Mechanics:** | (i) The Issuer will use commercially reasonable efforts to launch the exchange offer promptly following the date of signing of the ALPA Restructuring Agreement by the ALPA President. |

| | |
|---|---|
| | (ii) The expiration date (the "Expiration Date") of the exchange offer will be 90 days after the exchange offer commences. |
| | (iii) Options will be canceled as promptly as practicable on the date immediately following the Expiration Date. |
| | (iv) The Exchange Offer will provide to the holders of the Options sufficient information concerning the nature of the exchange and waivers, and the tax implications, if any, of the right to receive Restricted Stock, so as to enable the holder to make an informed choice. |
| **Additional Stock:** | The Issuer will issue additional shares of Restricted Stock (the "Additional Stock") equal to the number of Options granted under the 1998 Plan that are not eligible to be exchanged hereunder. The Additional Stock shall be distributed to the pilots on the pilots' seniority list of US Airways on the Effective Date and shall vest as to one-seventh of the number of shares subject thereto on each Vesting Date in the same manner as the 17.5 million shares of Restricted Stock under Attachment G. The Additional Stock will be delivered as soon as practicable after ALPA notifies the Issuer of the persons to receive such stock and the number of shares to be delivered to each such person |
| **Sixth Grant Date Options:** | In lieu of Options that would otherwise be granted under the Sixth Grant Date under Letter of Agreement # 69, the Issuer will issue a number of shares of common stock equal to the number of such Options that would otherwise have been granted. Such shares shall be issued as soon as practicable after ALPA notifies the Issuer of the persons to receive such stock and the number of shares to be delivered to each such person, and shall vest as to one seventh of the total amount on each vesting date in the same manner as the 17.5 million shares of Restricted Stock under Attachment G. |
| **Forfeitures:** | Forfeited shares will be returned to treasury shares for future issuances of Restricted Stock as directed by ALPA. |
| **Tax Treatment; Elections:** | No elections under Section 83(b) of the Internal Revenue Code of 1986 (the "Code"), shall be permitted with respect to any share of Restricted Stock. The parties intend that the Restricted Stock shall be issued with customary terms and conditions under Section 83 of the Code. Upon request of a recipient, the Company will withhold a specified number of shares to provide for potential anticipated tax liability due to the vesting of the Restricted Stock. (OK pending review by ALPA Tax Counsel) |

### Attachment I

### Governance

| Labor Advisory Committee: | The parties shall form a Labor Advisory Committee ("LAC"), consisting of one designee from ALPA, AFA, IAM, CWA, TWU and non-contract employees for the purpose of addressing issues of common interest among all employees at US Airways.<br><br>• The LAC or its designees shall meet with senior management on at least a quarterly basis to discuss the Company's financial and operating results and its projections, plans and strategies.<br><br>• The Company shall solicit, review and incorporate the input from the LAC into its projections, plans and strategies.<br><br>The LAC shall have the authority to request a special meeting at any time to discuss issues of mutual concern. |

**Board of Directors:**

| Corporation: | US Airways Group, Inc. |
|---|---|
| Size of Board: | The size of the Board will be determined in accordance with the by-laws of the corporation. |
| ALPA Preferred Board Membership: | • One share of a series of ALPA preferred stock (the "ALPA Preferred") shall be issued by US Airways Group, Inc., to the US Airways MEC for $1. Such share shall be all of the authorized, issued or outstanding shares of such series. Other than as set forth below, the ALPA Preferred shall not have any rights or preference.<br><br>• The ALPA Preferred shall entitle the holder to elect and remove one director to the Board ("Pilot Director"), for a period of not less than ten years from the Effective Date, provided, however, that the form of selection may be modified if required by a bankruptcy plan of reorganization, so long as ALPA's rights with respect to election and removal of a director are substantively preserved.<br><br>• Except as set forth above or as required by law, the ALPA Preferred shall have no other voting rights.<br><br>• The ALPA Preferred shall not be convertible.<br><br>• The ALPA Preferred shall be redeemable by the Company for |

43

| | $1 per share upon liquidation of the Company. |
|---|---|
| **Committee membership:** | The Pilot Director shall be a member of Board committees in accordance with the bylaws of the Company. |

## Attachment J

## Contract Modifications

The parties agree to include the following modifications in the ALPA Restructuring Agreement:

| TDY | • Permit use of TDY to assign flying to a pilot whose position has been eliminated in his domicile until he commences training for his new position up to the contractual TDY limit. |
|---|---|
| Covered Pilots | • Instructor pilots may conduct (1) landing currency, (2) re-establishing landing currencies (between 90 and 120 days) and (3) CAT II and CAT III sign-offs. □□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□□<br>• Covered Pilots shall provide 90 days notice prior to returning to the line.  Subject to the availability of his replacement, the 90 days may be reduced.<br><br>• Covered Pilots shall be required to fly carryover trips during a rotation month, provided the events count in the month flown.<br><br>• Covered Pilots while rotating shall be paid credited flight time or reserve guarantee, whichever is greater; override still applies. |
| Training | • Permit cancellation of a displaced pilot's vacation to attend training if the pilot would become inactive with pay.  Limit of less than 7 days and only with tailored intervention.<br><br>• Permit a pilot to be assigned an extra two-month training hold if awarded a new bid that also requires training. |

45

| | |
|---|---|
| **Passes for furloughed pilots** | Per Attachment E (grievance settlement), employee pass privileges will continue for furloughed pilots. |
| **Jumpseats** | • The Captain of every flight shall be made aware of all jump seat requests.<br><br>• Jumpseat riders accepted up to the number of empty seats on the aircraft. (Modeled after Hawaiian Jumpseat policy, including seating arrangements). US Airways to make best efforts to implement by January 1, 2003. |
| **Negotiating Committee** | Full flight pay loss for three members performing Negotiating Committee duties after June 15, 2002. |
| **Other items** | Discuss scheduling issues and any other items that either party may raise during the term of the ALPA Restructuring Agreement, at a time when contractual changes would have no impact on furloughs, and such changes would be exchanged for increases in rates of pay and reduction in benefit costs. Neither party shall be compelled to reach agreement on any such items. |

46

## Contract Items for Discussion

The parties will meet and discuss the following issues during the first six months of the ALPA Restructuring Agreement (12 months if in bankruptcy) with the understanding that the parties are not obligated to reach agreement on any of these items:

**ALPA Items for discussion:**

| Outside Flying | Contract Section 12 (B), F.O.M. Section 16.7<br>Discuss modifying rules for outside employment; allow outside flying within FAR limitations. |
|---|---|
| Jumpseats | 1. Cockpit jumpseat privileges for the alliance partner's pilots with reciprocal arrangements for US Airways pilots (establish E-Links to pilot database to implement ASAP).<br><br>2. Ability to view jumpseat reservations on CATCREW; see item #1, below.<br><br>3. Jumpseat reservations may only be made or changed by the jumpseat IVR system. The Jumpseat Committee shall monitor the jumpseat procedures/rules. Irregularities will be reported to Flight Operations. |
| Check Airmen | Establish procedures for RIF |
| Scheduling and other Contract Issues | 1. Add access to CATCREW/SABRE system on Company web site. End the need for CompuServe by 31 Dec. 2002<br><br>2. Develop a ratio between the number of block hours to be flown by an equipment type in a base and the number of primary lines that need to be built. The ratio could also be in relation to the number of pilots on the plane in the base.<br><br>3. Develop a definition of "adequate coverage".<br><br>4. Develop a definition for "reasonable effort" as it appears in the Agreement.<br><br>5. Section 11(E)1. To 5 calendar days of training in a row and then must have 2 days off, not 5 days of training in a calendar week.<br><br>6. Change the 2 hour show no go to ensure that a pilot who commences a revenue pairing and subsequently returns to the same airport that he started the duty period from gets the full duty day pay. 2 hour show no go does not apply; a minimum |

47

|  | day would be required. |
|---|---|
|  | 7. Section 11(J)2: Confirm that a training "strike" is not required by a pilot to exercise his rights under this section. |
|  | 8. Last Chance Agreements: Modify the AMPP to state that the Company will administer a standard "Last Chance" Agreement in all relevant cases. |
|  | 9. Southwest commuter policy. |
| Lodging | Move decision-making to Flight Operations Department. |
| Retirement Plan FAE Look-back | Extend the FAE look-back period under the US Airways Pilots Retirement Income Plan to the earlier of 10 years or January 1, 1998. |

ompany items for discussion:

| Line Productivity Items: | 1. Replace current bid system with a "Preferential" bid system. |
| | 2. Modify the Reserve system. |
| | 3. Eliminate individual trip sign-in and automate the AIL |
| | 4. Relax rescheduling restrictions. |
| | 5. Modify rescheduling pay to scheduled or actual, for segments that operate. |
| | 6. Create on-premise reserves |
| | 7. Combine B767D and B767I |
| Training: | 1. Use of medical/disabled pilots to conduct simulator training. |
| | 2. Establish training lines to reduce bought trips. |
| | 3. Permit pilot to move early to new bid to avoid inactive with pay status. |
| | 4. Permit use of TDY of up to contractual limits or extend training hold until next training class if a pilot is unable to report for initial training event and would become inactive with pay. |

**Attachment K**
**Health, Welfare and Retirement**

The parties agree to the following changes to the health, welfare and retirement plans for pilots:

**New Medical/Dental Plan Design Effective January 1, 2003**

For all eligible active and inactive employees, pre-Medicare eligible retirees (i.e. prior to age 65) and eligible dependents who are in-network for the selected Third Party Administrator (TPA), medical coverage will be in accordance with the attached PPO Plan Design Summary (Attachment K1), and the following;

For all eligible active and inactive employees, pre-Medicare eligible retirees (i.e. prior to age 65) and eligible dependents who are out-of-network for the selected TPA, medical coverage will be in accordance with the attached Indemnity Plan Design Summary (Attachment K1), and the following;

For all eligible Medicare-eligible retirees (i.e. after age 65) and eligible dependents, medical coverage will be in accordance with the attached Indemnity Plan Design Summary (Attachment K1), and the following;

For all eligible active and inactive employees, retirees, and their eligible dependents, dental coverage will be in accordance with the attached Managed Dental Plan Design Summary (Attachment K1), and the following:

1. Reasonable and Customary (R&C) standard provided for in the out-of-network and out-of-access portions of the medical and dental plans will be updated based on the Third Party Administrator's (TPA's) regular schedule but not less frequently than every six months at the 90th percentile of charges.
2. For purposes of Lifetime Maximums, there will be no carryover of charges from existing plans (i.e. fresh start).
3. The Company will use the TPA's standard definition of access for defining when one is considered to be in an area that is out-of-access with respect to the medical and dental plans. The out-of-access medical and dental plans will provide benefits at the in-network level, subject to R&C.
4. The company will adopt the protocols of the selected TPA regarding transition of care. Care while traveling abroad will be covered under the plan on an in-network basis for emergency and urgent care.
5. Spouses will be eligible for benefits under the medical/dental plan, subject to a non-duplication method of coordination (i.e. on a secondary basis only) with the exception of married employees both working for US Airways who will be subject to a come-out-whole method of coordination.
6. Letters of Agreement:
   a. Letter 22 (Managed Care) of the Collective Bargaining Agreement dated January 1, 1998 through January 2, 2003 (CBA) will be rescinded.
   b. Letter 23 (Managed Care Review Board) of the CBA will be revised to conform to Attachment K, i.e. subject to applicable law, the CBA pursuant to which this plan is established will set forth or incorporate by specific reference 1) provisions concerning the filing of benefit claims and the initial disposition of benefit claims, and 2) a grievance and arbitration procedure to which adverse benefit determinations are subject. The parties understand that the term "Managed Care" in this Attachment will, effective January 1, 2003, apply to the National PPO, National Indemnity Plan, and Managed Dental Plan, as described in Attachment K1.
   c. Letter 25 (ALPA Aeromedical Advisor) of the CBA will be revised to conform to Attachment K.
7. The Company will provide the Association with the basis for their premium equivalent calculations so that the Association may effectively audit those premium equivalents.

50

8. In selecting a vendor to administer its medical and dental plans, US Airways will make every effort to cause the least disruption to current provider access.

9. All current retirees will have the opportunity to elect applicable coverage in accordance with the attached Plan Design Summary (Attachment K1). Thereafter, retirees will only be permitted to elect coverage at the time of retirement.

10. Employee Contributions

   a. Employee contributions will be in accordance with the attached contribution charts (Attachments K2 through K5). The parties will discuss the contribution rates for retirees with retiree commencement dates prior to July 1, 2002 to determine whether their contributions will be substantially the same as they would have been under Letter 22. If the parties are unable to reach agreement on this issue prior to August 1, 2002, ALPA has been advised that the Company intends to implement for such retirees the same contribution schedules as specified in Attachments K2 through K5.

   b. The Company agrees to indemnify the Association from any and all liability, loss, damages, fines, penalties, excise taxes and costs, including expenses and reasonable attorneys' fees, which the Association sustains arising out of or in connection with the Company's method for determining employee contributions for employees who retired prior to July 1, 2002 and arising out of or connection with the Company's placement of current retirees in coverage under the Plan Design Summary (Attachment K1)., The Association agrees that it will not settle a matter covered by this indemnity at the Company's cost without the Company's approval, and that the Association will provide assistance as reasonably required or requested by the Company in any matter for which such indemnity is being provided.

   c. If a retired employee who retired prior to July 1, 2002 disputes the contribution rates established by the Company, the retired employee may refer the matter to the Vice President of Flight Operations or his designee. If such matter cannot be resolved within sixty days of submission, the retired employee may refer the matter to the System Board of Adjustment in accordance with Section 21 of the CBA.

## Changes to Pilot 401(k) Plan

1. Permit after-tax contributions to Pilots' 401(k) plan. US Airways will implement six (6) months from date of signing.

2. Establish brokerage account in Pilots' 401(k) plan pending approval from the Pension Investment Committee whose approval shall not be unreasonably withheld. All administrative costs associated with the brokerage account will be borne by the pilot.

3. Permit catch-up contributions to Pilots' 401(k) Plan pursuant to IRC Section 414 (v). US Airways will implement during the second half of 2003.

4. Increase pre-tax elective deferrals in Pilots' 401(k) Plan to 22%. Implementation will be effective January 1, 2003.

5. Add periodic distributions to Pilots' 401(k) Plan. US Airways will make this change effective January 1, 2003.

6. Formalize the non-qualified top hat plan arrangement. US Airways will draft a top hat plan document in conformance with the CBA for signatures, no later than ninety (90) days from the resolution of the pending GATT grievance. US Airways will provide to the Association a copy of the proposed plan for review and comment at least sixty days prior to promulgation of the plan. (Agreed to dual signatures for plan amendments consistent with Holden Award.)

**Changes to Flexible Spending Account**

1. Increase maximum medical/dental care expense reimbursement of the Flexible Spending Account Program under Letter of Agreement #24 to the lesser of $7,500 or the maximum amount permitted under the law.  US Airways will implement effective January 1, 2003.

**Miscellaneous**

The enclosed letter will serve as a basis for verification of the medical plan modifications made by the other employee groups.  Jerry Glass will provide documentation to the Association as to other class and craft contributions.

Captain Chris Beebe
MEC Chairman
US Airways MEC
Air Line Pilots Association, International

**Re: Verification of Medical Plan Modifications**

Dear Captain Beebe:

The purpose of this letter is to memorialize our agreement to arrange for a review of the modifications to the employee medical plans entered into by the various employee classes or crafts during the current restructuring negotiations. At the conclusion of these negotiations, the Company will provide the Association with complete details of the changes in the medical plans entered into between the Company and each US Airways class and craft. The information provided to the Association will include documentation of any differences between the pilots' medical plan and the medical plans of any other group and an explanation for any such deviations.

Sincerely,


Jerry Glass
Senior Vice President - Employee Relations

ACCEPTED AND AGREED:

_____
Christopher T. Beebe
MEC Chairman

**Attachment K[1]**

## US Airways
## National PPO - Plan Design Summary
### Eligible Actives, Inactives & Pre-65 Retirees

| Benefits | Option 1 | | Option 2 | | Option 3 | |
|---|---|---|---|---|---|---|
| | In-Network | Out-of-Network | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Annual Deductible [1][3]** | | | | | | |
| ■ Single | $300 | $600 | $150 | $300 | $150 | $300 |
| ■ Family | $600 | $1,200 | $300 | $600 | $300 | $600 |
| **Coinsurance** | 80% | 60% | 90% | 70% | 100% | 80% |
| **Annual Out-of-Pocket Maximum [1][2][3]** | | | | | | |
| ■ Single | $2,000 | $4,000 | $1,000 | $2,000 | N/A | $2,000 |
| ■ Family | $4,000 | $8,000 | $2,000 | $4,000 | N/A | $4,000 |
| **Lifetime Maximum [4]** | Unlimited | $1,000,000 | Unlimited | $1,000,000 | Unlimited | $1,000,000 |
| **Medical Office Services** | | | | | | |
| ■ Office Visits | 100% after $15 copay for primary care physicians and $25 copay for specialists[1] | Subject to deductible & coinsurance | 100% after $15 copay for primary care physicians and $25 copay for specialists[1] | Subject to deductible & coinsurance | 100% after $15 copay for primary care physicians and $25 copay for specialists[1] | Subject to deductible & coinsurance |
| ■ Physical Exams | 100% after $15 copay [1] | Not covered | 100% after $15 copay [1] | Not covered | 100% after $15 copay [1] | Not covered |
| ■ Well-Child Care | 100% after $15 copay [1] | Not covered | 100% after $15 copay [1] | Not covered | 100% after $15 copay [1] | Not covered |
| ■ Gynecological Exams | 100% after $15 copay for primary care physicians and $25 copay for specialists[1] | Annual well woman exams not covered except for pap smears & mammograms<br><br>Visits related to illness subject to deductible & coinsurance | 100% after $15 copay for primary care physicians and $25 copay for specialists[1] | Annual well woman exams not covered except for pap smears & mammograms<br><br>Visits related to illness subject to deductible & coinsurance | 100% after $15 copay for primary care physicians and $25 copay for specialists[1] | Annual well woman exams not covered except for pap smears & mammograms<br><br>Visits related to illness subject to deductible & coinsurance |
| ■ X-ray & Lab Tests | 100% if performed in physician office as part of office visit, otherwise subject to deductible & coinsurance | Subject to deductible & coinsurance | 100% if performed in physician office as part of office visit, otherwise subject to deductible & coinsurance | Subject to deductible & coinsurance | 100% if performed in physician office as part of office visit, otherwise subject to deductible | Subject to deductible & coinsurance |
| ■ Immunizations | 100% after $15 copay [1] | Not covered | 100% after $15 copay [1] | Not covered | 100% after $15 copay [1] | Not covered |

54

**Attachment K1**

## US Airways
## National PPO – Plan Design Summary
### Eligible Actives, Inactives & Pre-65 Retirees

| Benefits | Option 1 | | Option 2 | | Option 3 | |
|---|---|---|---|---|---|---|
| | In-Network | Out-of-Network | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Inpatient Hospital Services** [5] | | | | | | |
| ■ Days of Care | Subject to deductible & coinsurance  Unlimited number of days | Subject to deductible & coinsurance  Unlimited number of days | Subject to deductible & coinsurance  Unlimited number of days | Subject to deductible & coinsurance  Unlimited number of days | Subject to deductible  Unlimited number of days | Subject to deductible & coinsurance  Unlimited number of days |
| ■ Room Allowance  (Semi-private room covered; private room only when medically necessary) | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| ■ Intensive & Cardiac Care | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| ■ Supplies & Services | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| ■ Surgery | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| ■ Physician Visits | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| **Outpatient Hospital Services** | | | | | | |
| ■ Surgery | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| ■ X-ray & Lab Tests | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| ■ Pre-admission Testing | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| **Emergency Room Care** [6] | Covered in full after $100 copay [1] [6] (waived if admitted) | | Covered in full after $100 copay [1] [6] (waived if admitted) | | Covered in full after $100 copay [1] [6] (waived if admitted) | |
| **Maternity Care** | | | | | | |
| ■ Obstetric Services (Including office visits) | 100% after $25 copay (initial visit only) [1] | Subject to deductible & coinsurance | 100% after $25 copay (initial visit only) [1] | Subject to deductible & coinsurance | 100% after $25 copay (initial visit only) [1] | Subject to deductible & coinsurance |

55

**Attachment K1**

# US Airways
## National PPO – Plan Design Summary
### Eligible Actives, Inactives & Pre-65 Retirees

| Benefits | Option 1 | | Option 2 | | Option 3 | |
|---|---|---|---|---|---|---|
| | *In-Network* | *Out-of-Network* | *In-Network* | *Out-of-Network* | *In-Network* | *Out-of-Network* |
| ■ Hospital Charges (including newborn nursery care) | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| **Mental Health Care** [7] | | | | | | |
| ■ Inpatient Care [5] | Subject to deductible & coinsurance<br><br>Coinsurance level is 80% | Subject to deductible & coinsurance<br><br>Coinsurance level is 60%<br><br>30 day maximum per year | Subject to deductible & coinsurance<br><br>Coinsurance level is 90% | Subject to deductible & coinsurance<br><br>Coinsurance level is 70%<br><br>30 day maximum per year | Subject to deductible & coinsurance<br><br>Coinsurance level is 100% | Subject to deductible & coinsurance<br><br>Coinsurance level is 80%<br><br>30 day maximum per year |
| ■ Outpatient Care | 100% after $15 copay [1]<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>30 visit maximum per year | 100% after $15 copay [1]<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>30 visit maximum per year | 100% after $15 copay [1]<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>30 visit maximum per year |
| **Chemical Dependency** [7] | | | | | | |
| ■ Inpatient Care [5] | Subject to deductible & coinsurance<br><br>Coinsurance level is 80% | Subject to deductible & coinsurance<br><br>Coinsurance level is 60%<br><br>30 day maximum per year | Subject to deductible & coinsurance<br><br>Coinsurance level is 90% | Subject to deductible & coinsurance<br><br>Coinsurance level is 70%<br><br>30 day maximum per year | Subject to deductible & coinsurance<br><br>Coinsurance level is 100% | Subject to deductible & coinsurance<br><br>Coinsurance level is 80%<br><br>30 day maximum per year |
| ■ Outpatient Care | 100% after $15 copay [1]<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>30 visit maximum per year | 100% after $15 copay [1]<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>30 visit maximum per year | 100% after $15 copay [1]<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>30 visit maximum per year |

Attachment K1

# US Airways
## National PPO - Plan Design Summary
### Eligible Actives, Inactives & Pre-65 Retirees

| Benefits | Option 1 | | Option 2 | | Option 3 | |
|---|---|---|---|---|---|---|
| | In-Network | Out-of-Network | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Other Coverage** | | | | | | |
| ■ Durable Medical Equipment | 100% up to $500 [1] per year then subject to deductible & coinsurance | Subject to deductible & coinsurance | 100% up to $500 [1] per year then subject to deductible & coinsurance | Subject to deductible & coinsurance | 100% up to $500 [1] per year then subject to deductible | Subject to deductible & coinsurance |
| ■ Physical & Speech Therapy (20 combined in and out of network maximum per year) | 100% after $25 copay [1] | Subject to deductible & coinsurance | 100% after $25 copay [1] | Subject to deductible & coinsurance | 100% after $25 copay [1] | Subject to deductible & coinsurance |
| ■ Chiropractic Care | 100% after $25 copay [1] (20 visit maximum per year) | Not covered | 100% after $25 copay [1] (20 visit maximum per year) | Not covered | 100% after $25 copay [1] (20 visit maximum per year) | Not covered |
| ∎ Home Health Care | 100% when medically necessary (100 visit maximum per year) | Not covered | 100% when medically necessary (100 visit maximum per year) | Not covered | 100% when medically necessary (100 visit maximum per year) | Not covered |
| ■ Hospice Care | 100% up to $10,000 | Not covered | 100% up to $10,000 | Not covered | 100% up to $10,000 | Not covered |
| ■ Skilled Nursing Care (60 day combined in and out of network maximum per year) | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible | Subject to deductible & coinsurance |
| ■ Second Surgical Opinion | 100% after $25 copay [1] | Subject to deductible & coinsurance | 100% after $25 copay [1] | Subject to deductible & coinsurance | 100% after $25 copay [1] | Subject to deductible & coinsurance |
| ■ Dental Care | Covered only when the result of accidental injury then subject to the deductible & coinsurance | Covered only when the result of accidental injury then subject to the deductible & coinsurance | Covered only when the result of accidental injury then subject to the deductible & coinsurance | Covered only when the result of accidental injury then subject to the deductible & coinsurance | Covered only when the result of accidental injury then subject to the deductible | Covered only when the result of accidental injury then subject to the deductible & coinsurance |
| ■ Vision Care | Not covered | Not covered | Not covered | Not covered | Not covered | Not covered |
| ■ Hearing Care | Not covered | Not covered | Not covered | Not covered | Not covered | Not covered |

57

Attachment K1

# US Airways
## National PPO - Plan Design Summary
### Eligible Actives, Inactives & Pre-65 Retirees

| Benefits | Option 1 | | Option 2 | | Option 3 | |
|---|---|---|---|---|---|---|
| | In-Network | Out-of-Network | In-Network | Out-of-Network | In-Network | Out-of-Network |
| **Prescription Drug Coverage** [8] | | | | | | |
| ■ Retail Copay [1] (34-day supply) | | | | | | |
| — Generic | 100% after $10 copay | Not covered | 100% after $10 copay | Not covered | 100% after $10 copay | Not covered |
| — Brand formulary | 100% after $20 copay | Not covered | 100% after $20 copay | Not covered | 100% after $20 copay | Not covered |
| — Brand nonformulary | 100% after $30 copay | Not covered | 100% after $30 copay | Not covered | 100% after $30 copay | Not covered |
| ■ Mail Order Copay [1] (90-day supply) | | | | | | |
| — Generic | 100% after $20 copay | Not covered | 100% after $20 copay | Not covered | 100% after $20 copay | Not covered |
| — Brand formulary | 100% after $40 copay | Not covered | 100% after $40 copay | Not covered | 100% after $40 copay | Not covered |
| — Brand nonformulary | 100% after $60 copay | Not covered | 100% after $60 copay | Not covered | 100% after $60 copay | Not covered |
| **Coordination of Benefits** | Nonduplication | | Nonduplication | | Nonduplication | |

*Notes:*

*(1) Indexing of dollar amounts for deductibles and copays will not occur. Separate deductible applies for medical and mental health/chemical dependency.*
*(2) Out-of-network expenses can be applied toward satisfaction of in-network deductibles and out-of-pocket maximums. In-network expenses can be applied toward satisfaction of out-of-network deductibles and out-of-pocket maximums.*
*(3) Does not include deductible or copays. Separate for medical and mental health/chemical dependency.*
*(4) Combined medical and mental health/chemical dependency maximum.*
*(5) Network physicians required to notify plan and obtain approval for all inpatient hospital admissions (medical and mental health/chemical dependency.) Member responsible for notification and obtaining authorization for all out-of-network inpatient hospital admission. $250 penalty for non-notification.*
*(6) For non-emergency use of Emergency Room – coinsurance level reduced to 50%.*
*(7) Mental Health and Chemical Dependency services may be carved-out and administered by a TPA.*
*(8) Prescription drug coverage may be carved-out and administered by a TPA.*

**Attachment K1**

# US Airways
## National Indemnity Plan - Plan Design Summary
### Eligible Out-of-Area Actives, Inactives and Post-65 Retirees

| Benefits | Option 1 | Option 2 | Option 3 |
|---|---|---|---|
| **Annual Deductible [1]** | | | |
| ▪ Single | $300 | $150 | $150 |
| ▪ Family | $600 | $300 | $300 |
| **Coinsurance** | 80% | 90% | 100% |
| **Annual Out-of-Pocket Maximum [1] [2]** | | | |
| ▪ Single | $2,000 | $1,000 | N/A |
| ▪ Family | $4,000 | $2,000 | N/A |
| **Lifetime Maximum [3]** | Unlimited | Unlimited | Unlimited |
| **Medical Office Services** | | | |
| ▪ Office Visits | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ Physical Exams | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ Well-Child Care | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ Gynecological Exams | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ X-ray & Lab Tests | 100% if performed in physician office as part of office visit, otherwise subject to deductible & coinsurance | 100% if performed in physician office as part of office visit, otherwise subject to deductible & coinsurance | 100% if performed in physician office as part of office visit, otherwise subject to deductible |
| ▪ Immunizations | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| **Inpatient Hospital Services [4]** | | | |
| ▪ Days of Care | Subject to deductible & coinsurance   Unlimited number of days | Subject to deductible & coinsurance   Unlimited number of days | Subject to deductible   Unlimited number of days |
| ▪ Room Allowance (Semi-private room covered; private room only when medically necessary) | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ Intensive & Cardiac Care | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ Supplies & Services | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ Surgery | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ Physician Visits | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| **Outpatient Hospital Services** | | | |
| ▪ Surgery | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ X-ray & Lab Tests | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ▪ Pre-admission Testing | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |

**Attachment K1**

# US Airways
## National Indemnity Plan - Plan Design Summary
### Eligible Out-of-Area Actives, Inactives and Post-65 Retirees

| Benefits | Option 1 | Option 2 | Option 3 |
|---|---|---|---|
| **Emergency Room Care** [5] | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| **Maternity Care** | | | |
| ■ Obstetric Services (including office visits) | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ■ Hospital Charges (including newborn nursery care) | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| **Mental Health Care** [6] | | | |
| ■ Inpatient Care [4] | Subject to deductible & coinsurance<br><br>Coinsurance level is 80% | Subject to deductible & coinsurance<br><br>Coinsurance level is 90% | Subject to deductible & coinsurance<br><br>Coinsurance level is 100% |
| ■ Outpatient Care | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>No visit limit |
| **Chemical Dependency** [6] | | | |
| ■ Inpatient Care [4] | Subject to deductible & coinsurance<br><br>Coinsurance level is 80% | Subject to deductible & coinsurance<br><br>Coinsurance level is 90% | Subject to deductible & coinsurance<br><br>Coinsurance level is 100% |
| ■ Outpatient Care | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>No visit limit | Subject to deductible & coinsurance<br><br>Coinsurance level is 50%<br><br>No visit limit |
| **Other Coverage** | | | |
| ■ Durable Medical Equipment | 100% up to $500 [1] per year then Subject to deductible & coinsurance | 100% up to $500 [1] per year then Subject to deductible & coinsurance | 100% up to $500 [1] per year then Subject to deductible |
| ■ Physical & Speech Therapy (20 visit maximum per year) | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ■ Chiropractic Care (20 visit maximum per year) | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ■ Home Health Care (100 visit maximum per year) | 100% when medically necessary | 100% when medically necessary | 100% when medically necessary |
| ■ Hospice Care | 100% up to $10,000 | 100% up to $10,000 | 100% up to $10,000 |
| ■ Skilled Nursing Care (60 day maximum per year) | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |
| ■ Second Surgical Opinion | Subject to deductible & coinsurance | Subject to deductible & coinsurance | Subject to deductible |

**Attachment K1**

# US Airways
## National Indemnity Plan – Plan Design Summary
### Eligible Out-of-Area Actives, Inactives and Post-65 Retirees

| Benefits | Option 1 | Option 2 | Option 3 |
|---|---|---|---|
| ■ Dental Care | Covered only when the result of accidental injury then subject to the deductible & coinsurance | Covered only when the result of accidental injury then subject to the deductible & coinsurance | Covered only when the result of accidental injury then subject to the deductible |
| ■ Vision Care | Not covered | Not covered | Not covered |
| ■ Hearing Care | Not covered | Not covered | Not covered |
| **Prescription Drug Coverage (7)** | | | |
| ■ Retail Copay (3) (34-day supply) | | | |
| —— Generic | 100% after $10 copay | 100% after $10 copay | 100% after $10 copay |
| —— Brand formulary | 100% after $20 copay | 100% after $20 copay | 100% after $20 copay |
| —— Brand nonformulary | 100% after $30 copay | 100% after $30 copay | 100% after $30 copay |
| ■ Mail Order Copay (1) (90-day supply) | | | |
| —— Generic | 100% after $20 copay | 100% after $20 copay | 100% after $20 copay |
| —— Brand formulary | 100% after $40 copay | 100% after $40 copay | 100% after $40 copay |
| —— Brand nonformulary | 100% after $60 copay | 100% after $60 copay | 100% after $60 copay |
| **Coordination of Benefits** | Carve-out | Carve-out | Carve-out |

Notes:

(1) Indexing of dollar amounts for deductibles and prescription drug copays will not occur. Separate deductible applies for medical and mental health/chemical dependency.
(2) Does not include deductible. Separate for medical and mental health/chemical dependency.
(3) Combined medical and mental health/chemical dependency maximum.
(4) Member responsible for notification and obtaining authorization for all inpatient hospital admission (medical and mental health/chemical dependency) – $250 penalty for non-notification.
(5) For non-emergency use of Emergency Room- coinsurance level reduced to 50%.
(6) Mental Health and Chemical Dependency services may be carved-out and administered by a TPA.
(7) Prescription drug coverage may be carved-out and administered by a TPA.

**Attachment K1**

## US Airways
## Managed Dental Plan - Plan Design Summary
### Eligible Actives, Inactives and Retirees (pre- and post-65)

| Benefits | In-Network | Out-of-Network |
|---|---|---|
| Deductible | $0 | $50/$100 family |
| Coinsurance | | |
| ■ Preventive | 100% | 80% of R&C |
| ■ Minor | 80% | 50% of R&C |
| ■ Major | 50% | 50% of R&C |
| ■ Orthodontia | 50% | No coverage |
| Maximum | | |
| ■ Annual Maximum | $1,500 | $1,000 |
| ■ Lifetime Ortho Maximum | $2,000 | No coverage |

*Notes:*
1) *If participant resides outside of network area, provide reimbursement based on R&C and paid at the in-network level and orthodontia benefit of 50% to $2,000 lifetime maximum.*

**US Airways**
**Eligible Actives, Inactives & Pre-65 Retirees**

**Attachment K2**

| Year | Trend | | PPO 80/60 | | | | PPO 90/70 | | | | PPO 100/80 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Ee | Ee+Sp | Ee+Ch | Ee+Fam | Ee | Ee+Sp | Ee+Ch | Ee+Fam | Ee | Ee+Sp | Ee+Ch | Ee+Fam |
| **2003** | | | | | | | | | | | | | | |
| Premium Equivalent | | | 194.00 | 388.00 | 369.00 | 661.00 | 210.00 | 420.00 | 399.00 | 694.00 | 224.00 | 447.00 | 425.00 | 739.00 |
| Employee Contribution | | | 19.00 | 39.00 | 37.00 | 64.00 | 38.00 | 76.00 | 72.00 | 125.00 | 49.00 | 98.00 | 94.00 | 163.00 |
| **2004** | 13% | | | | | | | | | | | | | |
| Premium Equivalent | | | 219.22 | 438.44 | 416.97 | 724.35 | 237.30 | 474.60 | 450.87 | 784.22 | 253.12 | 506.11 | 480.25 | 835.07 |
| Employee Contribution | | | 22.00 | 44.00 | 42.00 | 72.00 | 43.00 | 85.00 | 81.00 | 141.00 | 56.00 | 111.00 | 106.00 | 184.00 |
| **2005** | 13% | | | | | | | | | | | | | |
| Premium Equivalent | | | 247.72 | 495.44 | 471.18 | 818.49 | 268.15 | 536.30 | 509.48 | 886.17 | 286.03 | 570.77 | 542.68 | 943.63 |
| Employee Contribution | | | 25.00 | 50.00 | 47.00 | 82.00 | 48.00 | 97.00 | 92.00 | 160.00 | 63.00 | 126.00 | 119.00 | 208.00 |
| **2006** | 11% | | | | | | | | | | | | | |
| Premium Equivalent | | | 274.97 | 549.94 | 523.01 | 908.52 | 297.65 | 595.29 | 565.52 | 983.65 | 317.49 | 633.55 | 600.27 | 1,047.43 |
| Employee Contribution | | | 27.00 | 55.00 | 52.00 | 91.00 | 54.00 | 107.00 | 102.00 | 177.00 | 70.00 | 139.00 | 133.00 | 230.00 |
| **2007** | 9% | | | | | | | | | | | | | |
| Premium Equivalent | | | 299.72 | 599.43 | 570.08 | 990.29 | 324.44 | 648.87 | 616.42 | 1,072.18 | 346.06 | 690.57 | 656.53 | 1,141.70 |
| Employee Contribution | | | 30.00 | 60.00 | 57.00 | 99.00 | 58.00 | 117.00 | 111.00 | 193.00 | 76.00 | 152.00 | 144.00 | 251.00 |
| **2008** | 7% | | | | | | | | | | | | | |
| Premium Equivalent | | | 320.70 | 641.39 | 609.99 | 1,059.61 | 347.15 | 694.29 | 659.57 | 1,147.23 | 370.28 | 738.91 | 702.54 | 1,221.62 |
| Employee Contribution | | | 32.00 | 64.00 | 61.00 | 106.00 | 62.00 | 125.00 | 119.00 | 207.00 | 81.00 | 163.00 | 155.00 | 269.00 |
| **2009** | 5% | | | | | | | | | | | | | |
| Premium Equivalent | | | 336.74 | 673.46 | 640.49 | 1,112.59 | 364.51 | 729.00 | 692.55 | 1,204.59 | 388.79 | 775.86 | 737.67 | 1,282.70 |
| Employee Contribution | | | 34.00 | 67.00 | 64.00 | 111.00 | 66.00 | 131.00 | 125.00 | 217.00 | 86.00 | 171.00 | 162.00 | 282.00 |

**Attachment K3**

## US Airways
### Eligible Post-65 Retirees

| | Trend | 80% Indemnity | | 90% Indemnity | | 100% Indemnity | |
|---|---|---|---|---|---|---|---|
| | | Ee | Ee + Fam | Ee | Ee + Fam | Ee | Ee + Fam |
| **2003** | | | | | | | |
| Premium Equivalent | | 182.00 | 364.00 | 202.00 | 404.00 | 244.00 | 488.00 |
| Employee Contribution | | 18.00 | 36.00 | 38.00 | 76.00 | 80.00 | 160.00 |
| **2004** | 19% | | | | | | |
| Premium Equivalent | | 216.58 | 433.16 | 240.38 | 480.76 | 290.36 | 580.72 |
| Employee Contribution | | 22.00 | 43.00 | 46.00 | 91.00 | 96.00 | 192.00 |
| **2005** | 19% | | | | | | |
| Premium Equivalent | | 257.73 | 515.46 | 286.05 | 572.10 | 345.53 | 691.06 |
| Employee Contribution | | 26.00 | 52.00 | 54.00 | 109.00 | 114.00 | 228.00 |
| **2006** | 16% | | | | | | |
| Premium Equivalent | | 298.97 | 597.93 | 331.82 | 663.64 | 400.81 | 801.63 |
| Employee Contribution | | 30.00 | 60.00 | 63.00 | 126.00 | 132.00 | 265.00 |
| **2007** | 13% | | | | | | |
| Premium Equivalent | | 337.84 | 675.66 | 374.96 | 749.91 | 452.92 | 905.84 |
| Employee Contribution | | 34.00 | 68.00 | 71.00 | 142.00 | 149.00 | 299.00 |
| **2008** | 10% | | | | | | |
| Premium Equivalent | | 371.62 | 743.23 | 412.46 | 824.90 | 498.21 | 996.42 |
| Employee Contribution | | 37.00 | 74.00 | 78.00 | 157.00 | 164.00 | 329.00 |
| **2009** | 7% | | | | | | |
| Premium Equivalent | | 397.63 | 795.26 | 441.33 | 882.64 | 533.08 | 1,066.17 |
| Employee Contribution | | 40.00 | 80.00 | 84.00 | 168.00 | 176.00 | 352.00 |

**US Airways**

**Split Families—Eligible Post-65 Retirees**

**Attachment K4**

| | 80% Plan | | | | 90% Plan | | | | PPO 100/80 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Over 65 - Ee | Over 65 Ee + Under 65 Ee | Two Over 65 Ee + One Under 65 Ee | Over 65 Ee + Under 65 Ee + Ch | Over 65 - Ee | Over 65 Ee + Under 65 Ee | Two Over 65 Ee + One Under 65 Ee | Over 65 Ee + Under 65 Ee + Ch | Over 65 - Ee | Over 65 Ee + Under 65 Ee | Two Over 65 Ee + One Under 65 Ee | Over 65 Ee + Under 65 Ee + Ch |
| 2003 Employee Contribution | 18.00 | 37.00 | 55.00 | 55.00 | 38.00 | 76.00 | 114.00 | 110.00 | 80.00 | 129.00 | 209.00 | 174.00 |
| 2004 Employee Contribution | 22.00 | 44.00 | 66.00 | 64.00 | 46.00 | 89.00 | 135.00 | 127.00 | 96.00 | 152.00 | 248.00 | 202.00 |
| 2005 Employee Contribution | 26.00 | 51.00 | 77.00 | 73.00 | 54.00 | 102.00 | 156.00 | 146.00 | 114.00 | 177.00 | 291.00 | 233.00 |
| 2006 Employee Contribution | 30.00 | 57.00 | 87.00 | 82.00 | 63.00 | 117.00 | 180.00 | 165.00 | 132.00 | 202.00 | 334.00 | 265.00 |
| 2007 Employee Contribution | 34.00 | 64.00 | 98.00 | 91.00 | 71.00 | 129.00 | 200.00 | 182.00 | 149.00 | 225.00 | 374.00 | 293.00 |
| 2008 Employee Contribution | 37.00 | 69.00 | 106.00 | 98.00 | 78.00 | 140.00 | 218.00 | 197.00 | 164.00 | 245.50 | 409.00 | 319.00 |
| 2009 Employee Contribution | 40.00 | 74.00 | 114.00 | 104.00 | 84.00 | 150.00 | 234.00 | 209.00 | 176.00 | 262.00 | 438.00 | 338.00 |

Notes:
1) Split family coverage occurs when at least one individual is over 65 and needs to be enrolled in the Indemnity plan and the other covered individual(s) is(are) under 65 and need to remain in the PPO plan

2) If there are only two individuals covered, the contribution is equal to the Ee cost of the Indemnity plan plus the Ee cost of the PPO plan

3) If there are two or more individuals covered, the contribution is equal to the Ee cost of the Indemnity plan plus the Ee + Ch cost of the PPO plan

4) All parties must be covered under the same plan option (i.e., over 65 individual in 80% Indemnity plan under 65 individual(s) in the 80/60 PPO

65

Attachment K5

US Airways
Managed Dental Plan

| | Trend | Eligible Actives, Inactives & Pre-65 Retirees Maximum Annual Contribution Increase of 6% | | | | Eligible Post-65 Retirees 100% Contribution | |
|---|---|---|---|---|---|---|---|
| | | Ee | Ee + Sp | Ee+ Ch | Ee + Fam | Ee | Ee + Sp |
| **2003** Premium Equivalent | | | | | | 26.00 | 52.00 |
| Employee Contribution | | 2.60 | 5.20 | 4.90 | 8.60 | 26.00 | 52.00 |
| **2004** Premium Equivalent | 6% | | | | | 28.00 | 55.00 |
| Employee Contribution | | 2.80 | 5.50 | 5.20 | 9.10 | 28.00 | 55.00 |
| **2005** Premium Equivalent | 6% | | | | | 30.00 | 58.00 |
| Employee Contribution | | 3.00 | 5.80 | 5.50 | 9.60 | 30.00 | 58.00 |
| **2006** Premium Equivalent | 6% | | | | | 32.00 | 61.00 |
| Employee Contribution | | 3.20 | 6.10 | 5.80 | 10.20 | 32.00 | 61.00 |
| **2007** Premium Equivalent | 6% | | | | | 34.00 | 65.00 |
| Employee Contribution | | 3.40 | 6.50 | 6.10 | 10.80 | 34.00 | 65.00 |
| **2008** Premium Equivalent | 6% | | | | | 36.00 | 69.00 |
| Employee Contribution | | 3.60 | 6.90 | 6.50 | 11.40 | 36.00 | 69.00 |
| **2009** Premium Equivalent | 6% | | | | | 38.00 | 73.00 |
| Employee Contribution | | 3.80 | 7.30 | 6.90 | 12.10 | 38.00 | 73.00 |

## Attachment L

## Contingent Acquisition Rights

| | |
|---|---|
| **Security:** | Contingent Acquisition Rights under Letter of Agreement 63 as modified by the terms of this Attachment L. |
| **Term:** | Extend to June 30, 2012 |
| **Face Amount:** | Remains at $250 million |
| **Triggering Event:** | Add to definition of Acquisition Triggering Event a new subparagraph (iv) to read:<br><br>(iv) there is a "Change in Control" as defined in Section 1(D)2 of the Agreement. |

**Attachment M**

**Provision of Information**

The Company and Association agree to the following:

| Frequency: | No less than quarterly; more frequently for monthly reports listed below and when information changes materially. |
|---|---|
| Recipients: | ALPA's E&FA Department, for distribution as deemed appropriate by ALPA to US Airways MEC, negotiating committee, advisors, and other committees relevant to the category of information. |
| Confidentiality: | Recipients will agree to hold as confidential information designated as confidential, unless such information is otherwise available. |
| Information to be provided: | As listed below. |

## Information to be Provided

1. Aircraft
    1.1. Tail numbers of owned aircraft
    1.2. Tail numbers of leased aircraft
    1.3. Fleet utilization/performance report
    1.4. MTC track schedules and a/c out-in service dates
    1.5. Block hours by tail no. by month
    1.6. Monthly routings of each aircraft
    1.7. Block hour projections by type
2. Fares
    2.1. Usage report (mix/route)
    2.2. Route profitability reports
3. Financial
    3.1. Current income statement
    3.2. Forecast income statement
    3.3. Forecast statement of change in financial position
    3.4. Current debt/equity ratios
    3.5. Forecast debt/equity ratios
    3.6. Credit agreements and tests
    3.7. Cash flow
    3.8. Financial statements and statistics
    3.9. Flash reports
4. Properties
    4.1. Operational assets and location
        4.1.1. Owned

   4.1.2. Leased
5. Pilots
   5.1. Electronic staffing model with inputs
   5.2. Permanent bid build-up data including utilization assumptions and input assumptions
   5.3. Monthly electronic pilot utilization data
   5.4. Monthly status change of pilots (including death, disability, resignation, termination, retirement).
6. Code Share and Alliance
   6.1. Agreements with code share and alliance partners and changes to such agreements
   6.2. Reports on the operational and financial results of the code share or alliance
   6.3. Data reflecting the number of passenger connections to US Airways flights and revenue generated for all code share and alliance flights
   6.4. Block hours of code share and alliance carriers to US Airways hubs, with and without code shares
   6.5. ASMs by city pair of code share and alliance flights
   6.6. ASMs by city pair of US Airways flights bearing designator code of code share and alliance partners
   6.7. Numbers of block seats purchased or reserved by US Airways, by city pair
   6.8. Fleet information for code share and alliance partners by type and tail numbers
   6.9. All notices to or from code share and alliance partners
7. Regular meetings, no less than quarterly, with
   7.1. CFO
   7.2. Market Planning
   7.3. Alliance Planning
   7.4. Resource Planning

**Attachment N**

**Terms for Bankruptcy Protection**

The Company, US Airways, and the Association will enter into the following Letter of Agreement as part of, in connection with, and applicable to the ALPA Restructuring Agreement.

---

**US Airways Group, Inc.**
**US Airways, Inc.**
2345 Crystal Drive
Arlington, VA 22227

Captain Duane Woerth
President
Air Line Pilots Association, International
1625 Massachusetts Avenue, N.W.
Washington, D.C. 20036

Captain Chris Beebe
Chairman
US Airways MEC
Air Line Pilots Association, International
One Thorn Run Center, Suite 400
Coraopolis, Pennsylvania 15108

Re: Restructuring Program

Dear Captains Woerth and Beebe:

The modifications to the 1998 Pilot Agreement (the "Modifications") reached in connection with the 2002 Restructuring Program of the US Airways Group, Inc. and US Airways, Inc. (together, the "Company") were agreed to by ALPA in furtherance of the Company's effort to successfully restructure its operations and capital structure and in consideration of the Company's waiver and agreements herein. The Modifications were embodied in the revised collective bargaining agreement between ALPA and the Company described as the "ALPA Restructuring Agreement."

This Letter of Agreement is a part of the Modifications and the ALPA Restructuring Agreement, and is effective only if and when the ALPA Restructuring Agreement becomes completely and unconditionally effective, and there are no conditions subsequent to its continuing effectiveness.

The Company believes that:

- The Modifications are based on the most complete and reliable information available to the Company;

- The Modifications permit the Company to avoid irreparable harm and provide for all the appropriate modifications to the 1998 Pilot Agreement that are necessary to permit the successful restructuring and reorganization of the Company.

- The balance of equities favors the ALPA Restructuring Agreement and the Company's adherence thereto.

The Company agrees that if a petition for bankruptcy is filed with respect to either US Airways Group, Inc. or US Airways, Inc., during the calendar year 2002 (the "Filing"):

1.    Neither the Company nor any affiliate will file or support any motion pursuant to 11 U.S.C. Sections 1113, 1113 (e), 1114, 1114 (h) or any other provision of the Bankruptcy Code, seeking rejection or modification of, or relief or interim relief from, the ALPA Restructuring Agreement.(a "Motion").

2.    The Company and its affiliates will actively oppose any such Motion if filed by another party.

3.    It is expressly recognized and agreed that if the ALPA Restructuring Agreement is not completely and unconditionally effective, and the 1998 Pilot Agreement therefore remains effective without the Modifications, the above two paragraphs are inapplicable and have no force or effect, and the Company may make or refrain from opposing any such Motion with regard to the 1998 Pilot Agreement.

In the event that the Company files a petition for bankruptcy and US Airways determines to request additional modifications to the ALPA Restructuring Agreement to support reduced cash flows, to secure debtor-in-possession financing, and/or attract capital, the Company and ALPA will meet to negotiate regarding such additional modifications to the mutual satisfaction of both parties within fifteen days of such determination. Neither party will be required to reach agreement regarding such modifications and the failure to reach such agreement will not affect the commitments in this letter.

Please indicate your agreement to the foregoing by signing below.

Yours truly,


David Siegel
President and Chief Executive Officer
US Airways Group, Inc.
US Airways, Inc.


Agreed this _____ day of July, 2002:


_____
Captain Duane Woerth
President, Air Line Pilots Association, International


_____
Captain Chris Beebe
Chairman, US Airways MEC
Air Line Pilots Association, International


72

**Attachment N-1**

**Changes to Restructuring Agreement in Bankruptcy**

From the date of filing of a bankruptcy petition concerning US Airways to the end of the twelfth month following such filing, temporary changes will be made in the ALPA Restructuring Agreement as described in Attachment N-1:

- Increase the hold for pilots in MDA or in Jets for Jobs as reflected in Attachment B.

- A Mainline pilot who accepts a Small Jet vacancy at an Express carrier must return to the same Mainline position that he occupied prior to his furlough. If the position does not exist at his former domicile, the pilot shall return to a domicile where such equipment is based.

- Reduce report for duty from 21 to 14 days.

- Extend training hold to 12 months.

- Reduce training notification to 7 days.

- Permit use of TDY up to 6 bid months in 12 months; no more than 4 assignments in 12 months.

- Permit training and/or movement of pilots up to 6 months before bid.

- Eliminate short block claims for September, 2002 and October 2002.

- Short call reserves to cover out of base flying.

- Increase Covered Pilot training events from 16 to 18.

**MidAtlantic Airways, Inc.**
**Parkridge One**
**1000 Commerce Drive**
**Pittsburgh PA 15275**

July 1, 2002

Captain Duane Woerth
President
Air Line Pilots Association, International
1625 Massachusetts Ave., NW
Washington DC 20036

Dear Captain Woerth:

MidAtlantic Airways, Inc. ("MDA") hereby recognizes the Air Line Pilots Association, International ("ALPA") as exclusive representative under the Railway Labor Act of the class or craft of MDA flight deck crewmembers (including check pilots, flight instructors, and simulator instructors).

In the 2002 ALPA Restructuring Agreement between ALPA and US Airways ("ALPA Restructuring Agreement), the parties agreed to modify Section One of the 1998 ALPA-US Airways collective bargaining agreement so as to permit MDA to operate under the US Airways designator code, name, logo, and marketing identity, so long as MDA adhered to specific terms and conditions specified in the ALPA Restructuring Agreement. These terms and conditions including terms regarding recognition, job opportunities for US Airways pilots and pilots employed by US Airways Wholly-Owned Carriers, scope, change in control and successorship, protection in asset sales, foreign operations, remedies, compensation, seniority and probation, union security, hiring rights and criteria, recall, flows between carriers, use of Small Jets, labor disputes, and Affected Pilot List and Participating Wholly Owned Pilot List. This will confirm that MDA will adhere to such terms and include them in the collective bargaining agreement to be negotiated between ALPA and MDA.

As to all other terms and conditions, as well as final language for the above, MDA will expeditiously negotiate a labor agreement with ALPA on the following schedule:

1. At ALPA's request, negotiations will begin 21 days after the effective date of the 2002 restructuring agreement between ALPA and US Airways. Also at ALPA's request, negotiations will begin later at a later date, provided that, in the event of such delayed negotiations, if the parties do not reach agreement by the date that MDA commences pilot training, MDA may implement rates of pay, rules and working conditions. Such implemented terms will be without prejudice to the positions of the parties in the negotiations, facilitation and arbitration specified below, and, without agreement of the parties, will not be considered as a benchmark or reference point for any terms that are subject to the negotiations.

74

2. If the parties are unable to complete an agreement within 60 days after the commencement of negotiations, they agree to facilitation and arbitration of open terms, to be completed within 120 days of the commencement of negotiations.

3. If no agreement is reached within 60 days from the commencement of negotiations, MDA and ALPA will engage in facilitation with the facilitator/arbitrator "Neutral") for up to 30 days.

4. If no agreement is reached within 90 days from the commencement of negotiations, the unresolved issues will be submitted to the Neutral for binding arbitration, with the process to be completed within 120 days of the commencement of negotiations.

5. As to each individual open issue the Neutral shall select the proposal that more closely conforms to the average of ACO, CALEX, and CMR.

6. The Neutral shall be selected in accordance with the following procedure:

   (a)    The parties will exchange lists containing seven acceptable names as suggested Neutrals.

   (b)    If there are any common names on the lists, those neutrals shall be contacted to determine their availability.

   (c)    The neutral who is most available in accordance with the procedure stated in this letter shall be selected.

   (d)    If there are no names in common on the lists, the parties will attempt to compile an agreed list. If unable to do so promptly, they will immediately contact the National Mediation Board and request a list of seven nationally-recognized arbitrators.

   (e)    The Neutral will be selected by alternately striking from the list identified in subparagraph (d) above. The first strike will be determined by a coin toss.

   (f)    If the selected neutral is unable to serve in accordance with the parties' time frame, the previously struck neutral will be selected. If no neutral is able to serve in accordance with such time frame, the parties may either extend the time frame by agreement or request that the NMB supply an additional list of seven names, continuing this process until a Neutral is selected.

Please indicate ALPA's agreement with the above by signing in the space below:

Yours truly,

Robert T. Brayton
President
MidAtlantic Airways, Inc.

I agree with the above terms:

_____
Duane Woerth
President
Air Line Pilots Association, International

76