IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| US AIRLINE PILOTS ASSOCIATION, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Civil Action No. 2:14-cv-7 |
| | ) | |
| US AIRWAYS, INC., | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Presently before the Court is a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6), filed by the Defendant, US Airways, Inc. ("US Airways"). For the reasons

that follow, the motion will be granted.

Plaintiff, US Airline Pilots Association ("USAPA"), brings this action seeking to vacate

an arbitration award issued pursuant to the Railway Labor Act, 45 U.S.C. §§ 151-88 ("RLA") on

the grounds that the arbitrator ignored the clear and unambiguous language in the parties'

agreements and also on the grounds that the arbitrator did not comply with the procedural

requirements of the RLA. Defendant contends that neither allegation states a claim upon which

relief may be granted.

### Facts

US Airways and the Air Line Pilots Association, International ("ALPA"), the certified

collective bargaining representative of U.S. Airways Pilots ("the Pilots"), signed a Collective

Bargaining Agreement (the "CBA") with an effective date of January 1, 1998, that related to

rates of pay, rules, and working conditions. (Compl. ¶ 7.)[1] Specifically, Section 3 of the CBA

controlled the Pilots' hourly rates of pay. (Id.)

_____

[1] ECF No. 1.

<u>The Bargaining History Behind the 3% Pay Raise</u>

In 2002, US Airways implemented a restructuring program to decrease operating costs, including cuts to the Pilots' pay rates. ALPA and the Pilots negotiated in good faith over US Airways' request for concessions, and the parties signed a Restructuring Agreement with an effective date of July 1, 2002. (Compl. ¶ 9 & Ex. A.) Regarding the Pilots' rates of pay, the Restructuring Agreement stated, in pertinent part:

> Revisions to Hourly Pay Rates: The hourly pay rates contained in Section 3 of the [CBA] will be revised as follows:
>
> • The hourly pay rates in effect on June 30, 2002 will be known as the Book Rates. The actual rates will each be reduced on the Effective Date to the rates that were in effect on April 30, 2001. The parity review scheduled for May 1, 2003, and Letter of Agreement 47, as amended, will be canceled.
>
> • Eliminate the LOA #61 1% lump sum increase scheduled for 2003.
>
> • Hourly pay rates will be increased by a compounded 1% effective on May 1, 2003, May 1, 2004, May 1, 2005, and May 1, 2006, and further increased by a compounded 2% effective on May 1, 2007 and May 1, 2008, and 3% on May 1 of the succeeding status quo period (i.e., the period past the Agreement amendable date).

(Compl. ¶ 11 & Ex. A at 1.) The Restructuring Agreement extended the amendable date of the CBA (i.e., the date the CBA would next be subject to further negotiations) to December 31, 2008. (Compl. ¶ 10.)

This agreement reduced the then current pilot pay rates to rates that were in effect one year prior, cancelled a scheduled parity review, and eliminated a 1% lump sum increase due to the Pilots. In exchange, US Airways agreed to a series of annual compounded percentage rate increases effective May 1, 2003, through the succeeding status quo period. (Compl. ¶ 12.) The negotiated increases expressly included a 3% increase to pilot pay rates effective May 1 of the succeeding year past the amendable date, which at the time was December 31, 2008. (Compl.

¶ 13.)

On August 11, 2002, US Airways filed for voluntary Chapter 11 bankruptcy. (Compl.

¶ 14.)  Plaintiff alleges that US Airways used the bankruptcy to extract severe financial

concessions from the Pilots in the form of a Letter of Agreement titled "Supplementary Cost

Reductions" ("LOA 84"). (Compl. ¶¶ 14-15 & Ex. B.)  LOA 84 amended the Restructuring

Agreement effective January 1, 2003, and reduced the Pilots' rate of pay, yet again, as follows:

> HOURLY RATES OF PAY: The actual hourly rates of pay to be paid to all pilots under the [CBA as amended by the Restructuring Agreement] will in each year be less than or greater than the actual hourly rates of pay specified under the Restructuring Agreement (i.e., the actual hourly rates as increased each May 1) by the following percentage amounts. These percentages are not cumulative but are in each instance an adjustment of the hourly rate of pay that would otherwise have been paid under the Restructuring Agreement in the applicable pay period. Hence, in each year there will be two actual hourly rates of pay applicable to each position: the rate in effect from January 1 through April 30 and the rate in effect from May 1 through December 31.

| YEAR | PERCENTAGE CHANGE TO APPLICABLE RESTRUCTURING AGREEMENT RATES OF P A Y |
|------|------|
| 2003 | (8.0%) |
| 2004 | (6.5%) |
| 2005 | (5.0%) |
| 2006 | (0.0%) No reduction |
| 2007 | 2.0% |
| 2008 | 2.0% |
| 2009 & beyond | As per Restructuring Agreement |

(Compl. ¶ 16 & Ex. B at 1-2.)

LOA 84 required US Airways to increase Pilot pay rates by 2.0% for the years 2007 and

2008.  For the years "2009 & beyond," US Airways agreed that the percentage change to Pilots'

rates of pay would be "as per Restructuring Agreement."  Plaintiff maintains that the

Restructuring Agreement expressly included a 3% increase to pilot pay rates effective May 1 of

the succeeding year past the CBA's amendable date, and that LOA 84 preserved that scheduled

increase. (Compl. ¶ 18.)  It notes that LOA 84 provides that "[o]ther than as specifically

modified in these documents all terms and conditions of the ALPA-US Airways Collective

Bargaining Agreement effective January 1, 1998 as amended by the Restructuring Agreement ...

shall remain in full force and effect."  (Compl. ¶ 19 & Ex. B at L84-2.)

On September 9, 2004, US Airways filed for Chapter 11 bankruptcy for the second time

in two years, through which it extracted, yet again, additional financial concessions from the

Pilots, including more concessions to pay rates.  (Compl. ¶ 20.)  On October 21, 2004, US

Airways and ALPA signed a Letter of Agreement titled "Transformation Plan" ("LOA 93").

(Compl. ¶ 21& Ex. C.)  LOA 93 extended the CBA's amendable date from December 31, 2008,

to December 31, 2009, and again amended the Pilots' rate of pay as follows:

> Revisions to Hourly Pay Rates: The rates of pay specified in Section 3 of the
> [CBA], as modified by the Restructuring Agreement, will be revised as follows:
>
> 1. Freeze current rates effective 5/01/04 through 12/31/09.
> 2. Reduce rates as frozen by 18.0%
> 3. Reduce International pay override, as stated in Section 3(F) and Section 18(C),
> by 18% for transoceanic trips; eliminate international override for non-
> transoceanic trips.
> 4. Pay all flying at day rate.

(Compl. ¶¶ 22-23 & Ex. C at 4.)  LOA 93 froze Pilots' pay rates only through December, 31,

2009. (Compl. ¶ 24.)  Plaintiff maintains that LOA 93 did not state in any manner, or even

suggest, that the scheduled 3% raise was removed from the CBA.  Despite these additional

concessions, LOA 93 made clear that reductions in pay rates were limited to those terms

expressly included in LOA 93, and that all other terms of the CBA as amended remained in full

force and effect.  LOA 93 provides:

> NOW THEREFORE the parties mutually agree to amend the [CBA],
> Restructuring Agreement and the subsequent Letters of Agreement as stated in the
> Transformation Plan Term Sheet, below. Other than as specifically modified in
> these documents, all terms and conditions of the ALPA-US AIRWAYS

> Collective Bargaining Agreement effective January 1, 1998 as amended shall
> remain in full force and effect.

(Compl. ¶ 25 & Ex. C at 2.)  Plaintiff asserts that the words could not be clearer in meaning. It

further contends that the parties reiterated this point in the section immediately preceding the

revisions to hourly pay rates, as LOA 93 provides that:

> Other terms of 1998 Agreement, as amended: Other than as specifically modified
> in these documents, all terms and conditions of the ALPA-US AIRWAYS
> Collective Bargaining Agreement effective January 1, 1998 as amended shall
> remain in full force and effect.

(Compl. Ex. C at 4.)  Plaintiff argues that LOA 93 did not amend or even address the 3%

increase to pilot pay rates effective May 1 of the succeeding year past the CBA's amendable

date, making that scheduled raise one of the many "other terms" of the CBA, as amended, that

"remain[ed] in full force and effect."  (Compl. ¶ 28.)  Plaintiff argues that the parties set forth

their agreement in the language of the agreements themselves.

Arbitration of the Restoration Issue

Through a letter dated February 27, 2009, US Airways notified USAPA[2] of its position

that the pay rates in effect as of December 31, 2009, would remain in effect for Pilots as of

January 1, 2010. (Compl. ¶ 30.)  On June 16, 2009, USAPA filed Grievance No. BPR 09-06-02

(the "Grievance") whereby USAPA claimed that the CBA as amended required the Pilots' pay

rates to revert to what the rates would have been effective January 1, 2010, and not the then

current significantly reduced rates then in effect (the "Restoration Issue"). (Compl. ¶ 31.)

USAPA ultimately submitted the Grievance to a System Board of Adjustment ("SBA")

on September 9, 2009.[3]  (Compl. ¶ 34.)  USAPA defined the issue before the SBA as:

---

[2] On April 18, 2008, USAPA replaced ALPA as the certified collective bargaining representative
of the Pilots. (Compl. ¶ 6.)

Whether [US Airways] misinterpreted and misapplied Section 3 of [the CBA], Letters of Agreement 84 and 93, the July 2002 Restructuring Agreement and all other related sections of the Agreement and Letters of Agreement, as well as past practice, when they stated that they do not intend to revert East rates of pay back to the status quo (as provided in the Restructuring Agreement of 2002 and LOA 84) after the last pay modification provided for in LOA 93 ceases to have effect after 12/31/09.

(Compl. ¶ 34 & Ex. E.)

Thus, Plaintiff indicates that the submitted issue did not include the 3% increase to pay rates "effective May 1 of the succeeding year past the CBA's amendable date," as that raise was not scheduled to occur until May 1, 2010 and thus was not ripe. Indeed, in its view, it had no way of knowing at that time whether US Airways would honor the 3% pay raise on May 1.

The SBA consisted of five members: two members selected by USAPA (Capt. Dave Ciabattoni and Theresa Murphy (the "USAPA Board Members")), two members selected by US Airways (Beth Holdren and Paul Jones (the "US Airways Board Members")), and a neutral member, Richard Kasher ("Arbitrator Kasher"). (Compl. ¶ 35.)

The SBA held a hearing (the "Arbitration") from February 1 through February 4, 2010. (Compl. ¶ 36.) On the first day of the Arbitration the parties stipulated that the issue before the SBA was: "Whether the pay rates in place on January 1, 2010 violate LOA 93, and, if so, what is the appropriate remedy?" (Id.) The record closed on April 21, 2010. (Id.)

<u>US Airways Does Not Increase Pay Rates by 3% on May 1, 2010</u>

Plaintiff alleges that May 1, 2010 marked "May 1 of the succeeding status quo period (i.e., the period past the Agreement amendable date)" as defined in the Restructuring Agreement

---

[3] Per the CBA's grievance procedure, Captain Lyle Hogg, the Vice-President of Flight Operations, held an initial hearing on the Grievance on July 24, 2009. (Compl. ¶ 32.) On August 20, 2009, Captain Hogg denied the Grievance and held the rates of pay existing as of December 31, 2009, would remain in effect on January 1, 2010. (Id.) Under the CBA, the issue went to the SBA, which was created to determine disputes growing out of grievances or out of the interpretation or application of the CBA. (Compl. ¶ 33 & Ex. D.)

and as amended in LOA 93. (Compl. ¶ 37.) The Pilots believed that they were scheduled to receive a long-overdue increase of 3% to their pay rates in accordance with the amended CBA. (Id.) US Airways, however, refused to increase the Pilots' pay rates effective May 1, 2010. (Compl. ¶ 38.)

On June 1, 2010, approximately 20 Pilots, including USAPA Board Member Capt. Dave Ciabattoni, filed grievances with USAPA challenging US Airways' refusal to implement the scheduled 3% increase to the Pilots' pay rates as of May 1, 2010 (the "3% Issue"). (Compl. ¶ 39.) While those grievances progressed, on June 11, 2010, USAPA and US Airways submitted post-hearing briefs to the SBA regarding the Restoration Issue. (Id.)

On October 8, 2010, three Pilots (individually and on behalf of all similarly situated pilots) further pursued their grievances on the 3% Issue under the CBA's grievance procedure. (Compl. ¶ 40.) After a hearing held on March 29, 2011, Capt. Ed Schmidt denied the grievances on April 11, 2011, stating that the 3% Issue was already pending before the SBA as part of the Grievance on the Restoration Issue. (Compl. ¶ 41.)

Plaintiff alleges that the USAPA Board Members certainly did not consider the 3% Issue to be part of the Grievance arbitrated in February 2010, as evidenced by the fact that USAPA Board Member Ciabattoni filed his own individual grievance on the 3% Issue. (Compl. ¶ 42.) The three Pilots appealed the denial of their grievances on the 3% Issue. (Compl. ¶ 43.) In May 2011, Capt. Hogg held those appeals in abeyance pending resolution of the Restoration Issue. (Id.)

Although the Arbitration hearing concluded in February 2010, the Restoration Issue lingered for more than eighteen months without any action or direction from Arbitrator Kasher. On August 11, 2011, Arbitrator Kasher finally issued to the SBA a draft statement of

background facts and positions of the parties. (Compl. ¶ 44.) On November 9, 2011, Arbitrator

Kasher circulated the first draft opinion on the Restoration Issue and indicated that he would

deny the Grievance. (Compl. ¶ 45.) Although Capt. Hogg was holding the individual grievances

in abeyance waiting for this award, the draft opinion did not address the 3% Issue. (Compl. ¶ 46.)

<u>Arbitrator Kasher Refuses to Hold Hearings on the 3% Issue</u>

On March 6, 2012, the SBA held an executive session in Philadelphia. (Compl. ¶ 48.)

With the Pilots' individual grievances in limbo due to Capt. Hogg's decision, USAPA Board

Members requested clarification from Arbitrator Kasher as to whether he considered the 3%

Issue to be before him. (<u>Id.</u>) Arbitrator Kasher admitted that he did not consider the 3% Issue to

be part of the stipulated Restoration Issue that was submitted to the SBA twenty-five (25)

months earlier, and that he was not aware that the 3% Issue was before him. (Compl. ¶ 49.)

USAPA Board Members immediately demanded that Kasher reopen the record, hold hearings on

the 3% Issue, and allow USAPA the opportunity to present evidence on the issue so the SBA

could timely consider the relevant testimony and exhibits. (Compl. ¶ 50.) Arbitrator Kasher

denied USAPA's request. (Compl. ¶ 51.)

Instead, Arbitrator Kasher ordered the parties to submit briefs, not to exceed 10 pages, on

the 3% Issue based solely on the existing record. (Compl. ¶ 52.) Plaintiff notes that the

testimony in the record then in existence was presented February 1-4, 2010, three months before

it contends US Airways violated the CBA by refusing to recognize the 3% raise, and at a time

when the SBA did not know it was deciding anything other than the Restoration Issue. (<u>Id.</u>) The

parties nonetheless were compelled to comply with the Arbitrator's order, and submitted briefs

on April 9, 2012.

On October 9, 2012, Arbitrator Kasher circulated a second draft opinion and award

addressing the Restoration Issue.  On October 10, 2012, Kasher circulated his first draft opinion

and award concerning the 3% Issue, which indicated that he would deny the 3% increase to Pilot

pay rates that had not been increased since 2002. (Compl. ¶ 53.)  USAPA Board Members

immediately requested another executive session to discuss the draft opinion on the 3% Issue and

Kasher's refusal to conduct hearings. (Compl. ¶ 54.)  At an executive session held on January 3,

2013, Arbitrator Kasher admitted that he was experiencing "memory issues" as a result of his

health issues, but he yet again refused the USAPA Board Members' demand that the SBA

conduct additional hearings. (Compl. ¶ 55.)

On January 9, 2013, Arbitrator Kasher issued the final award on the Restoration Issue

denying the Grievance. (Compl. ¶ 56 & Ex. F.)  Over the next five months, the parties exchanged

a series of letters to Arbitrator Kasher concerning how the 3% Issue came before the SBA.

(Compl. ¶ 57.)  Plaintiff alleges that, because of Arbitrator Kasher's obvious confusion on the

issues, in correspondence dated January 11, 2013, January 21, 2013 and March 14, 2013,

USAPA Board Members requested, yet again, that Arbitrator Kasher either relinquish

jurisdiction of the 3% Issue or conduct hearings to provide the parties a fair opportunity to

present all available evidence on the issue.  (Compl. ¶ 57.)  At Arbitrator Kasher's request, on

May 19, 2013, USAPA resent him duplicate copies of all documents related to the 3% Issue sent

by the parties between January 3, 2013 and May 19, 2013. (Compl. ¶ 58.)

<u>Arbitrator Kasher Denies USAPA Relief on the 3% Issue</u>

On August 14, 2013, which Plaintiff observes was nearly three and a half years after the

Arbitration concluded, and seventeen months after he first believed that the 3% Issue was before

the SBA and asserted jurisdiction over it, Arbitrator Kasher issued a final Opinion and Award

(the "Award") that denied USAPA relief on the 3% Issue. (Compl. ¶ 59 & Ex. G.)[4]

In denying USAPA relief, Arbitrator Kasher found that the language of "the Restructuring Agreement or Letter of Agreement 93 discloses no specific reference to post-amendable date pay increases." (Compl. ¶ 61 & Ex. G at 9.)  However, Plaintiff argues that Kasher did not cite, discuss, or even mention in the Award LOA 93's language that expressly preserved all terms and conditions of the amended CBA that were not otherwise modified by LOA 93, which included the 3% raise.  (Compl. ¶ 62.)

Plaintiff states that the Award did not explain how an agreement to freeze pay rates "through 12/31/09" somehow erased from the CBA the existing 3% pay raise scheduled to take effect on May 1, 2010.  Plaintiff argues that Arbitrator Kasher not only ignored the controlling language, he denied its very existence.  (Compl. ¶ 63.)

Procedural History

Plaintiff filed this action on January 2, 2014 (ECF No. 1).  Federal question jurisdiction is based on the RLA claims, 28 U.S.C. § 1331, 1337; 45 U.S.C. § 153, First (q), and § 153, Second. Count I alleges that the award should be vacated on the grounds that the arbitrator ignored the clear and unambiguous language in LOA 93.  Count II alleges that the award should be vacated on the alternative ground that the arbitrator violated the RLA by refusing to allow testimony specific to the 3% Issue and by preventing USAPA from being heard in person on the issue.[5]

On March 11, 2014, Defendant filed a motion to dismiss (ECF No. 11).  Plaintiff filed a brief in opposition on April 11, 2014 (ECF No. 15).  Defendant filed a reply brief on April 25, 2014 (ECF No. 16) and Plaintiff filed a sur-reply brief on May 22, 2014 (ECF No. 17).

---

[4] Plaintiff notes that the USAPA Board Members dissented and authored a dissenting opinion. (Compl. ¶ 60 & Ex. H.)

[5] Although Defendant contends that Counts I and II are inconsistent with each other, it is common and completely acceptable for complaints to plead claims in the alternative.

<u>Standard of Review</u>

The Supreme Court has issued two decisions that pertain to the standard of review for a motion to dismiss for failure to state a claim upon which relief could be granted under Federal Rule of Civil Procedure 12(b)(6). The Court held that a complaint must include factual allegations that "state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "[W]ithout some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 232 (3d Cir. 2008). In determining whether a plaintiff has met this standard, a court must reject legal conclusions unsupported by factual allegations, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements;" "labels and conclusions;" and "'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Iqbal</u>, 556 U.S. at 678 (citations omitted). Mere "possibilities" of misconduct are insufficient. <u>Id.</u> at 679. The Court of Appeals recently summarized the inquiry as follows:

> To determine the sufficiency of a complaint, a court must take three steps. First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 1947, 173 L.Ed.2d 868 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u> at 1950. Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." <u>Id.</u> This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

<u>Malleus v. George</u>, 641 F.3d 560, 563 (3d Cir. 2011).

"Although a district court may not consider matters extraneous to the pleadings, 'a document *integral to or explicitly relied* upon in the complaint may be considered without

11

converting the motion to dismiss into one for summary judgment.'" <u>U.S. Express Lines, Ltd. v.</u>

<u>Higgins</u>, 281 F.3d 383, 388 (3d Cir. 2002) (quoting <u>In re Burlington Coat Factory Sec. Litig.</u>,

114 F.3d 1410, 1426 (3d Cir. 1997)). "A court may consider an undisputedly authentic document

that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on

the document." <u>Miller v. Clinton County</u>, 544 F.3d 542, 550 (3d Cir. 2008) (quotation omitted).

In addition, "[c]ourts ruling on Rule 12(b)(6) motions may take judicial notice of public

records." <u>Anspach ex rel. Anspach v. City of Phila.</u>, 503 F.3d 256, 273 n.11 (3d Cir. 2007).

Plaintiff argues that Defendant's motion goes well beyond the Complaint's allegations

and relies on both briefs and limited transcript cites of testimony offered at the Arbitration to

argue that USAPA fails to state a claim. Thus, it contends that this material is improperly

submitted and should not be considered.[6] Defendant argues that the transcript of the arbitration

proceeding, the briefs submitted by the parties to Arbitrator Kasher and the correspondence from

USAPA sent to Arbitrator Kasher are all referenced in the Complaint (Compl. ¶¶ 36, 39, 52, 57),

and therefore these items may be considered herein.

The CBA, the arbitration award and the other documents attached to the Complaint are

clearly appropriate for consideration in connection with the motion to dismiss. The transcript of

the arbitration hearing would constitute an undisputedly authentic document upon which the

Complaint relies. Defendant goes too far, however, in suggesting that the Complaint "relies" on

the briefs and correspondence sent to Arbitrator Kasher merely because their existence is

mentioned in the Complaint and Plaintiff is undoubtedly in possession of such documents. It

cites no case in which a court has actually considered such documents in the context of a motion

---

[6] On the other hand, Plaintiff quotes from three of the documents submitted by Defendant. <u>See</u>
ECF No. 15 at 23 (citing Robertson Decl. (ECF No. 13) Ex. 2 at 24, Ex. 4 at 2); ECF No. 17 at 4-
5 (citing ECF No. 13 Ex. 7 at 2).

to dismiss and this Court will not consider them herein.

Defendant argues that: 1) Count I should be dismissed because the Award confirms that Arbitrator Kasher carefully considered the language of the documents and construed their applicability and Plaintiff simply disagrees with the result; and 2) Arbitrator Kasher did hold a four-day hearing in which Plaintiff was represented in person by counsel and at which testimony and documentary evidence on the 3% Issue were presented, and subsequently post-hearing briefs were submitted, thus there were no procedural irregularities.

Plaintiff responds that: 1) the Award does not apply or even address the controlling terms of the agreements on this issue; and 2) the Court must scrutinize the arbitration record to determine whether a "full and fair hearing has been afforded" and here that did not occur and because the arbitrator issued an opinion 42 months after last hearing live testimony and refused to permit further testimony on the issue after being made aware that it is before him, a strong case can be made that the SBA did not comply with the procedural requirements of the RLA.

In a reply brief, Defendant argues that: 1) Plaintiff has quoted selectively from the Award and ignored language which demonstrates that Arbitrator Kasher considered and ultimately rejected USAPA's argument about language in the Restructuring Agreement; 2) Plaintiff's allegations about its inability to present evidence is belied by evidence that USAPA knew that the 3% Issue was pending before the SBA and awaiting resolution and it cites no specific evidence that it wanted to present but was prevented from introducing; 3) Plaintiff's argument that Arbitrator Kasher was uncertain whether the 3% Issue was before him is irrelevant because the parties agreed to the SBA's jurisdiction to decide the issue; and 4) Plaintiff's argument about the lapse of time between the hearing and the Award on the 3% Issue fails because neither the CBA nor the RLA requires that a decision be rendered within a specified amount of time and the

only case Plaintiff cites imposed a strict requirement in this regard.

In its sur-reply brief, Plaintiff argues that: 1) although Defendant purports to rely on the Award, the fact is that the Award does not cite, apply, address, explain or even recognize the relevant language of LOA 93, LOA 84 or the Restructuring Agreement; 2) the "beliefs" of USAPA Board Members are highly relevant because they could have called additional witnesses at the hearing if they had known that the 3% Issue was before them; 3) Defendant's argument that Arbitrator Kasher was aware that the 3% Issue was before him inappropriately relies on snippets from a voluminous record to suggest the allegations of the Complaint are false, but that is inappropriate in the context of a motion to dismiss, and the same is true of Defendant's argument that USAPA somehow waived the fundamental flaw by agreeing to submit supplemental briefs on the 3% Issue, in addition to which the letter from which Defendant selectively quotes actually explained to Arbitrator Kasher exactly why further hearings were necessary; and 4) the case Plaintiff cites regarding delay recognized policy reasons in the RLA for prompt resolution of grievances and vacated an award rendered 14 months after the record closed, far less than the 42-month delay that occurred here.

Scope of Review of RLA Claims

The RLA provides that:

> The court shall have jurisdiction to affirm the order of the division, or to set it aside, in whole or in part, or it may remand the proceedings to the division for such further action as it may direct. On such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.

45 U.S.C. § 153, First (q). The Supreme Court has referred to this scope of review as "among

the narrowest known to the law." Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 91 (1978). See also United Steelworkers of America Local 1913 v. Union R.R. Co., 648 F.2d 905, 910-11 (3d Cir. 1981) (review is limited to the three narrow statutory categories and does not allow a court to analyze whether an arbitration board comported with due process).[7]  The RLA's coverage extends to the airline industry by requiring all "carriers" to establish "boards of adjustment." Independent Ass'n of Continental Pilots v. Continental Airlines, 155 F.3d 685, 688 n.1 (3d Cir. 1998) (citing 45 U.S.C. § 184).

Plaintiff does not invoke the fraud or corruption provision, but does contend that the SBA failed to confine itself to matters within its jurisdiction and failed to comply with the requirements of the RLA.  Defendant denies that this is so.

Matters Within SBA Jurisdiction

Plaintiff contends that the Award ignores the CBA's plain language and thus it cannot stand.  Defendant argues that Plaintiff merely disagrees with the Award, which is insufficient to challenge it.

Plaintiff cites four cases in support of its position.  In American Eagle Airlines, Inc. v. Air Line Pilots Association, International, 343 F.3d 401, 406-07 (5th Cir. 2003), the court held that an arbitration board ignored the plain language of the CBA by finding that the airline's failure to schedule a first-step hearing regarding a pilot's termination constituted a breach of the CBA, because the explicit language of the CBA stated that failure to schedule such a first-step

---

[7] The Supreme Court identified a difference of opinion among the courts of appeals on this question, Union Pac. R.R. Co. v. Brotherhood of Locomotive Engr's & Trainmen Gen. Comm. of Adjustment, Cent. Region, 558 U.S. 67, 75 & n.4 (2009), but declined to resolve the question in that case, thus leaving circuit precedent binding on the issue.  Zurawski v. Southeastern Pa. Transp. Auth., 441 F. App'x 133, 136 (3d Cir. 2011).

hearing would be considered tantamount to denying the grievance.[8]  In <u>Consolidated Rail Corp.</u>

<u>v. United Transportation Union</u>, 1991 WL 1022892 (E.D. Pa. Jun 10, 1991), the court held that

when an arbitrator found for the union in a dispute regarding whether an employee was owed

penalty compensation for performing an initial terminal air brake test on his own train without

discussing the "incidental work rule" pursuant to which the railroad had denied such

compensation, he had "substituted his own notion of industrial justice" for the terms of the

parties' agreement and the award had to be vacated.  In <u>Brotherhood of Locomotive Engineers</u>

<u>and Trainmen v. Union Railroad Co.</u>, 660 F. Supp. 2d 582 (W.D. Pa. 2009), <u>appeal dismissed</u>,

391 F. App'x 182 (3d Cir. 2010), the arbitrator did not answer the question presented to him—he

was asked whether a provision of a CBA was violated when the railroad assigned trainmen and

not engineers to perform remote control operations, but instead he raised and decided the

question of whether one engineer could be considered a "crew" under the terms of the CBA (an

issue the parties agreed on and had not presented for resolution).  Because the board's

jurisdiction was strictly limited by the SBA agreement between the parties to those disputes

described by the parties in their respective questions at issue, the court held that the board acted

outside of the scope of its jurisdiction and the award had to be vacated.[9]

In <u>United Transportation Union v. Pittsburgh, Chartiers and Youghiogheny Railway Co.</u>,

353 F. Supp. 1305 (W.D. Pa.), <u>appeal dismissed</u>, 485 F.2d 683 (3d Cir. 1973), the court held that

_____

[8] Notably, Judge Dennis dissented, concluding that even this finding by the board represented an
"arguable" construction of the CBA which the court should not have disturbed under the very
narrow standard of review.  <u>Id.</u> at 411 (Dennis, J., dissenting).
[9] In a footnote, Plaintiff refers to the language in the CBA in this case, which states that the SBA
"shall consider any dispute properly submitted to it by the President of the Association or by the
Vice President – Labor Relations when such dispute has not been previously settled in
accordance with the terms provided for in the Pilots' Agreement." (Compl. Ex. D at 21-1 ¶ E.)
This cannot be compared with the language at issue in <u>Brotherhood of Locomotive Engineers</u>,
namely that "the Board will confine itself strictly to decisions as to the questions specifically
submitted to it." 660 F. Supp. 2d at 589.

an arbitration board improperly relied on an employee's record of 22 accidents over the period of his employment to warrant the railroad's decision to dismiss him when it discounted the specific incident that led to his dismissal. The board had no rational basis for concluding that the employee was at fault in these incidents and improperly cited the fact that the accidents had subjected the railroad to expensive litigation. "The conclusion which the Board reached is, therefore, lacking any foundation in reason or fact and is an act tantamount to exceeding its authority and jurisdiction." Id. at 1306.

Defendant argues that these cases are inapplicable because Arbitrator Kasher did not ignore the language of the agreements and that two of them (Brother of Local Engineers and Pittsburgh, Chartiers) did not involve arbitrators ignoring contractual language, but instead answering a question not presented and acting with no evidence, respectively. Defendant notes that the Award acknowledged that USAPA's position was that US Airways':

> failure to give its pilots the contractually agreed upon 3% pay raise on May 1, 2010 violates the provisions contained in the Restructuring Agreement and Letter of Agreement 93.
>
> Relying upon Union Exhibit No. 1, USAPA argues that the underlying Restructuring Agreement and Letter of Agreement 93 provide for annual 3% pay raises each May 1st during the status quo period.

(Compl. Ex. G at 2.) Nevertheless, Arbitrator Kasher concluded that the "critical language" of LOA 93 was the section quoted above from page 4 of that document (which contains no mention of the 3% raise) and stated that this provision was:

> an opportunity for [USAPA] to propose and have [US Airways] agree to incorporate specific terms in the agreement that would clearly and unambiguously establish a requirement that would survive the "freeze" and preserve the [USAPA's] proposed 3% post-amendable date pay increases. [USAPA] did not achieve such a goal.

(Id. at 9.)

17

In other words, Arbitrator Kasher did not find Plaintiff's position to be supported by what he concluded was the critical language of LOA 93. Implicit in this conclusion is the notion that, even if another provision of LOA 93 appeared to refer the reader to the Restructuring Agreement to resolve the 3% Issue (because it was not specifically addressed in LOA 93 and therefore remained in "full force and effect"), he did not find this provision to be dispositive. The question before this Court is not whether Arbitrator Kasher's decision was correct or well-reasoned, but only whether it was "rationally inferable" based on the parties' agreements. Brotherhood of R.R. Trainmen v. Central of Ga. Ry. Co., 415 F.2d 403, 412 (5th Cir. 1969). Put another way, "as long as [an honest] arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." Eastern Associated Coal Corp. v. United Mine Workers of America, Dist. 17, 531 U.S. 57, 62 (2000) (citation omitted). Because the Award is "rationally inferable" based on the parties' agreements and Arbitrator Kasher was arguably construing the parties' agreements, Plaintiff cannot state a claim that he acted outside of the SBA's jurisdiction or ignored the plain language of the agreements. Therefore, with respect to Count I, the motion to dismiss will be granted.

Complying with RLA Requirements

The RLA provides that:

> The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation and application of agreements concerning rates of pay, rules, or working conditions ... shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

45 U.S.C. § 153, First (i). The next subsection states that:

> Parties may be heard either in person, by counsel, or by other
> representatives, as they may respectively elect, and the several divisions of the
> Adjustment Board shall give due notice of all hearings to the employee or
> employees and the carrier or carriers involved in any disputes submitted to them.

45 U.S.C. § 153, First (j). Failure of an SBA to comply with the RLA's requirements constitutes grounds to set aside an award. 45 U.S.C. § 153, First (p). The CBA provides that: "Evidence may be presented either orally or in writing, or both." (Compl. Ex. D at 21-3 ¶ I.)

Plaintiff argues that Arbitrator Kasher violated these precepts when he refused to allow it to submit live testimony focused on the 3% Issue, but instead requested 10-page briefs long after the record had closed. In its opposition brief, it presents the additional argument that the Award should be vacated because the SBA took an unreasonable amount of time to issue it. Defendant argues that Arbitrator Kasher did not violate any precepts of the RLA and that the case Plaintiff cites regarding a late award is distinguishable.

<u>Ability to Present Evidence</u>

As Defendant has noted, during the hearing held between February 1 and 4, 2010, at which USAPA was represented in person by counsel, testimony and documentary evidence regarding the 3% Issue were presented as part of the arbitration of the Restoration Issue. (Robertson Decl. ¶ 2 & Ex. 1 at 44-45, 161-63, 166, 174, 195, 244-45, 344-45, 450, 452-54, 463-64, 471-72, 533, 543, 548.) Moreover, the parties submitted post-hearing and supplemental briefs based on the evidence adduced at the hearing as ordered by Arbitrator Kasher. (Compl. ¶ 52.) Plaintiff argues that Defendant has referred to only 21 pages out of a 728-page transcript from the four-day hearing and that it had no choice but to submit briefs when ordered to do so.

Typically, a federal court's review of a board's decision under the "failure to comply" prong of § 153, First (q) has been limited to determining whether the board complied with the procedural requirements of the RLA, which are limited to providing the parties "due notice" and

the ability to be heard.  <u>United Transp. Union v. National R.R. Passenger Corp.</u>, 588 F.3d 805, 811 (2d Cir. 2009).  The RLA does not, however, require an SBA to hold additional hearings when, in the judgment of the SBA, the issue can be determined based upon a hearing that was already held and subsequent briefing.  In addition, as cited above, the CBA indicates that evidence may be presented either orally or in writing or both, but does not require any one particular method.  Thus, Plaintiff has pointed to no provision of the RLA or the CBA that would permit this claim to proceed.  <u>See</u> <u>Martino v. Metro N. Commuter R.R. Co.</u>, 2013 WL 3208548, at *8 (D. Conn. June 24, 2013) (although the plaintiff complained that the SBA was not presented with a statement of facts and all supporting data bearing upon the dispute, it was clear that both sides submitted briefs and the award included factual findings, so there was no plausible merit to the plaintiff's allegation).

Plaintiff cites <u>Hart v. Overseas National Airways, Inc.</u>, 541 F.2d 386, 393 (3d Cir. 1976), for the proposition that a court should "scrutinize the arbitration award to determine if a 'full and fair hearing' has been afforded."  Defendant argues that Plaintiff cannot rely upon this language because it invoked a due process analysis that the Court of Appeals has since rejected for RLA review purposes, <u>United Steelworkers</u>, 648 F.2d at 911.  Defendant is correct and Plaintiff cannot invoke the due process review language of the <u>Hart</u> case.  If the Court were to scrutinize the arbitration award to determine if a full and fair hearing was afforded, it would exceed the narrow scope of review for RLA awards.

Plaintiff spends a considerable amount of time arguing that neither USAPA nor Arbitrator Kasher "knew" in February 2010 that the 3% Issue was part of the pending arbitration over the Restoration Issue and Defendant has responded in kind.  <u>Compare</u> Pl.'s Br. Opp'n (ECF No. 15) at 20-22 (USAPA did not know that the 3% Issue, which had not even arisen until May

1, 2010, was part of the proceeding, Arbitrator Kasher included no discussion of the 3% Issue in his November 9, 2011 draft opinion on the Restoration Issue and admitted at the March 6, 2012 executive session that he did not consider the 3% Issue to be part of the issue on which live evidence was presented two years earlier and was not aware that it was before him) with Def.'s Reply Br. (ECF No. 16) at 6-8 (USAPA introduced evidence regarding the 3% Issue at the hearing and addressed it in subsequent briefing and whether Arbitrator Kasher knew it was before him in February 2010 or March 2012 is irrelevant because the parties subsequently agreed to his jurisdiction to decide the issue and to submit supplemental briefs) with Pl.'s Sur-reply Br. (ECF No. 17) at 4-6 (the agreed-upon and submitted question at the February 2010 hearing did not include the 3% Issue and USAPA did not "waive" this fundamental flaw by agreeing to submit supplemental briefs on the issue).

What Plaintiff has not done, however, is explain why this argument is relevant. The record is undisputed that: 1) the parties arbitrated the Restoration Issue in February 2010 and there was at least some testimony presented regarding the 3% raise that would later become the 3% Issue; 2) although Arbitrator Kasher at first believed the issue was not before him, he later concluded that the 3% Issue was within the jurisdiction of the SBA and he ordered the parties to submit supplemental briefing on the question; 3) although USAPA did not agree with this ruling, it nevertheless submitted supplemental briefing in which it reiterated that a supplemental hearing was required to address the complexities of the issue and the fact that a considerable amount of time had passed since the hearing; and 4) Arbitrator Kasher did not accept USAPA's position, but instead found that he was able to resolve the issue based upon the February 2010 hearing and the supplemental briefing. Given this sequence of events, the only claim that Plaintiff could advance is a generalized claim that Arbitrator Kasher's actions denied it a full and fair

opportunity to present the 3% Issue,[10] but the Court of Appeals has rejected this kind of due process claim in RLA cases, as explained above. Again, the question before the Court is not whether Arbitrator Kasher handled this matter in the best was possible, or even whether he "should have" convened a supplemental hearing in 2013, only whether he violated the procedural requirements of the RLA. For all of the reasons explained above, Plaintiff cannot state a claim that he did.

Vacating an Untimely Award

Plaintiff argues that the Award, which was issued 42 months after the hearing was held, was untimely.[11] The only case that Plaintiff cites in support of its argument that the decision should be vacated because it was rendered in an untimely fashion is Jones v. St. Louis-San Francisco Railway Co., 728 F.2d 257 (6th Cir. 1984). In that case, the court held that if the parties state in unequivocal terms that they intend for arbitrators to lose jurisdiction by failing to issue an award within a certain time period, then a late award is automatically invalidated. However, the strict 15-day time limit set in the CBA did not so indicate and therefore the court concluded that the board had jurisdiction for a "reasonable time thereafter." Id. at 265. Nevertheless, the court invalidated the award because it was issued 14 months after completion of the hearing, which the court concluded was not a reasonable time thereafter. In making this determination, the court turned for guidance to 29 C.F.R. § 1404.15(a) (the Rules of the Federal Mediation Service), which encourages arbitrators to render awards within 60 days of the closing

---

[10] Plaintiff specifically argues that: "There is nothing fair about litigating one grievance only to find out years later that the arbitrator will decide a *second* issue without affording the chance to offer focused testimony on the later issue." (ECF No. 15 at 22.)

[11] Plaintiff has not explained why it calculates a 42-month delay beginning at the conclusion of the hearing on February 4, 2010 (see ECF No. 17 at 6, in which Plaintiff argues that the Award was issued "three years after the record closed"). Rather, the period should be measured from the date the parties submitted their final briefs and the record was complete.

of the record unless otherwise agreed by the parties or specified by law.[12]  The court

acknowledged that other courts had not taken such a clearly-defined position, but concluded that

its decision was consistent with other cases because the plaintiff had made numerous attempts to

have the board issue a timely award and he suffered harm as a result of the delay.  Id. at 266.

In this case, the CBA contains no time limit and is thus distinguishable.  See Schneider v.

Southern Ry. Co., 822 F.2d 22, 25 (6th Cir. 1987) (when agreement provided only that decisions

had to be rendered "within a reasonable time," Jones was inapposite and the court would not turn

to outside sources to define "reasonable time.")  In addition, the Jones case is not binding on this

Court and Plaintiff cites no case under the RLA in which the Court of Appeals for the Third

Circuit has recognized the "reasonable time thereafter" principle, much less the specific 60-day

period approved of in Jones.  Finally, Plaintiff has not alleged that it complained about the delay

prior to the Award being issued or that it suffered prejudice from the delay and thus, even under

the standard utilized in Jones, it would not be able to state a claim.  See also Hill v. Norfolk &

Western Ry. Co., 814 F.2d 1192, 1199 (7th Cir. 1987) (failure to object to board's delay prior to

award being issued waives the right to raise the delay argument in court).  Therefore, with

respect to Count II, the motion to dismiss will be granted.

The Court of Appeals has held that, "even when a plaintiff does not seek leave to amend,

if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative

amendment, unless an amendment would be inequitable or futile."  Alston v. Parker, 363 F.3d

229, 235 (3d Cir. 2004) (citation omitted).  "Dismissal without leave to amend is justified only

on the grounds of bad faith, undue delay, prejudice, or futility."  Id. at 236 (citation omitted).

---

[12] The court also held that the arbitration board failed to comply with the requirements of the RLA, 45 U.S.C. § 153, First, (j) and (n), when one of the members comprising the majority who issued the award had not heard the evidence but was appointed subsequently.  Id. at 262.

In this case, it would be futile to allow Plaintiff to amend the Complaint because the documents attached thereto as well as the documents attached to Defendant's motion to dismiss which the Court has reviewed leave no doubt that USAPA cannot raise any legitimate challenge to the Award.  Therefore, the Complaint will be dismissed with prejudice.

For these reasons, the motion to dismiss submitted on behalf of the defendant (ECF No. 11) will be granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

US AIRLINE PILOTS ASSOCIATION,           )
                    Plaintiff,           )
                                   )
      vs                             )      Civil Action No. 2:14-cv-7
                                   )
US AIRWAYS, INC.,                         )
                    Defendant.           )

ORDER

AND NOW, this 12th day of June, 2014,

IT IS HEREBY ORDERED that the motion to dismiss filed by Defendant (ECF No. 11)

is granted and the Complaint is dismissed with prejudice.


s/Robert C. Mitchell_____
ROBERT C. MITCHELL
United States Magistrate Judge